UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SAMANTHA SOHMER, STEPHEN HAWKS, and KATHY L. FELLGREN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE SERVICES, INC. and UNITED HEALTHCARE INSURANCE COMPANY, <br><br> Defendants. | **CLASS ACTION COMPLAINT** <br><br> CIVIL NO.   3:18-cv-1262 <br><br> DEMAND FOR JURY TRIAL <br><br> JULY 30, 2018 |

Plaintiffs Samantha Sohmer, Stephen Hawks, and Kathy L. Fellgren ("Plaintiffs"), by their undersigned attorneys, allege the following based upon their knowledge, the investigation conducted by Plaintiffs' counsel, and upon information and belief. Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

**INTRODUCTION**

1.      Plaintiffs, who received prescription drug benefits through group health plans administered and managed by Defendants United Healthcare Services, Inc. or United HealthCare Insurance Company ("Defendants") bring this action on behalf of themselves and a Class and Subclasses of similarly situated persons alleging (a) violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*; (b) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and (c) state law claims for breach of contract and breach of implied covenant of good faith and fair dealing, resulting from Defendants' common fraudulent and deceptive scheme to artificially

inflate prescription costs causing consumers to pay more than they otherwise should have paid for medically necessary prescription drugs.

2.      About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits. A feature of most of these plans is the shared cost of prescription drugs. Normally, when a patient[1] fills a prescription for a medically necessary prescription drug under his or her health care plan, the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost directly to the pharmacy in the form of a copayment (often a set dollar amount), coinsurance (often a percentage of the cost) or deductible payment. Defendants directed the pharmacies to collect these cost-sharing payments on Defendants' behalf from patients at the time the prescription is filled.  Pharmacies are not allowed to waive or reduce the amount collected under the plans.

3.      Defendants administer health and pharmacy benefits provided to patients. Defendants provide these pharmacy benefits in part through their wholly owned subsidiaries, Optum, Inc. ("Optum, Inc."), Optum Rx, Inc. ("OptumRx") and OptumRX of Illinois, Inc ("Optum Illinois") (collectively, "Optum"), which, on information and belief, operate together as a pharmacy benefit manager ("PBM").[2] PBM services include, *inter alia*: participating in managing a network of pharmacies that will serve as participating pharmacies at which Defendants' patients obtain prescriptions; working with Defendants to set and dictate copayment

---

[1] The term "patient" refers to a plan participant or beneficiary under a health Plan with prescription drug coverage administered by Defendants who purchases prescription drugs pursuant to that Plan.

[2] Optum, Inc., a Delaware corporation with its principal place of business in Minnesota, is a United subsidiary that manages pharmacy benefits. OptumRx, a California corporation with its principal place of business in California, is a subsidiary of OptumRx Holdings, LLC, which in turn is a subsidiary of Optum, Inc.

amounts, coinsurance amounts, and deductibles (if applicable) to pharmacies; and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

4.     As set forth below, Defendants have engaged in a scheme to defraud patients by overcharging patients for the cost of medically necessary prescription drugs. Patients, including Plaintiffs and the Class (defined below), paid excessive charges to participating pharmacies for prescription drugs. Under their plans ("Plan" or "Plans"),[3] Plaintiffs' cost-sharing amounts were limited to the amount paid to the pharmacy for prescription drugs. Unbeknownst to Plaintiffs and the Class, Defendants forced the pharmacies to misrepresent the cost-sharing amounts for prescription drugs and charge Plaintiffs and Class members excessive amounts and forced patients to pay excessive cost-sharing amounts. These excessive payments by patients were then retained by the pharmacies or "clawed back" from the pharmacies by Defendants. This is not a matter of mistaken or innocently erroneous calculations: it is a pervasive, intentional scheme to overcharge Plaintiffs and everyone similarly situated in connection with their prescription drug purchases.

5.     For example, as detailed below, the express language of Plaintiffs' Plans promised that they would not pay more for prescription drugs than Defendants agreed to pay the network pharmacy. In violation of these Plan provisions, Defendants exercised their unilateral discretion to

---

[3] Unless otherwise specified, the term "Plans" as used herein includes both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between Defendant United HealthCare Services, Inc. or its affiliates and a plan, as well as health plans implemented through an insurance policy underwritten and issued by Defendant United HealthCare Insurance Company or its affiliates, to cover medical and prescription drug expenses incurred by a plan. "Plans" also includes both public and private plans and governmental program plans, such as Affordable Care Act, and Medicare Part D, Medicare Advantage, or PDP plans. "Plans" subject to ERISA are denoted "ERISA Plans." Both Plaintiff Sohmer and Plaintiff Hawks participate in ERISA Plans.

require network pharmacies to charge Plaintiffs unauthorized and excessive cost-sharing amounts for prescription drugs that were not based on the amount paid to the pharmacies ("Overcharges").

6.     Moreover, Defendants profited from their scheme by "clawing back" some or all of these Overcharges by requiring the pharmacies to pay the Overcharges to Defendants after the pharmacies collected the Overcharges from Plaintiffs and the Class or by paying pharmacies less than they would have had they followed the Plans.

7.     For example, on October 24, 2016, Defendants unilaterally determined that Plaintiff Sohmer had to pay a $15 copayment to a pharmacy to purchase a prescription drug and required the pharmacy to collect this amount from Plaintiff Sohmer. Unknown to Plaintiff Sohmer, the $15 copayment Defendants required the pharmacy to collect from her was ***almost ███ the contracted fee*** the pharmacy was paid to fill the prescription. Specifically, on information and belief, Defendants' contract with the pharmacy provided that the pharmacy would be paid only $██ for the prescription. But, Defendants unilaterally directed and required the pharmacy to charge and collect the $15 copayment from Plaintiff Sohmer, thereby forcing Plaintiff Sohmer to pay not only the $██ contracted cost of the drug, but an additional $██. When, like in this example, the cost-share ($15) exceeds the amount paid to the pharmacy ($██), the $██ difference is the "Spread."[4]

8.     Similarly, on March 11, 2015, Defendants unilaterally determined that Plaintiff Hawks would pay a $40 copayment to purchase a prescription drug and required the pharmacy to collect this amount from him. However, on information and belief, the pharmacy was only paid

---

[4] While the Overcharge equals the Spread under a Plan that provides for copayments, with a coinsurance Plan which, for example, provides for 20% coinsurance, a plaintiff may be overcharged by paying a percentage of an inflated amount.

$███ to fill the prescription. In other words, Plaintiff Hawks's $40 copayment was nearly ***four***

***times*** the pharmacy's fee, creating $███ of Spread.

9.      Plaintiff Fellgren was also subject to Overcharges. For example, she purchased the

same drug six times in 2016, paying only $███ (the amount Defendants agreed to pay the

pharmacy) for each of the first four purchases. However, for her last two purchases in 2016—

once she was no longer in the deductible phase of her prescription drug coverage—Plaintiff

Fellgren began paying a $10 copayment per prescription for the exact same drug. This allowed

Defendants to claw back $███ for each purchase, or ***over███ times*** what appears to be the

pharmacy's payment amount.

10.      Upon information and belief, Defendants initially allowed pharmacies to keep

Spread and other Overcharges. However, at some point during the Class Period, Defendants

began requiring the pharmacies to turn over the Spread to Defendants, which payment from the

pharmacy to the Defendants is known as a "Clawback."  Regardless of whether there is a

Clawback, Spread-pricing is unlawful under the Plans.

11.      These example transactions are not unusual.  On information and belief,

Defendants systematically instructed pharmacies to charge cost-sharing payments that exceeded

the amounts that they have contractually agreed that pharmacies should be paid for drugs and then

instructed the pharmacies to remit the Clawbacks to Defendants for their own accounts.

12.      Had Defendants lived up to their fiduciary, disclosure, and other legal obligations

under the Plan, Plaintiffs would not have paid more than the amount the pharmacy agreed to be

paid by Defendants for prescription drugs. Defendants should have and easily could have

exercised their unilateral discretion to comply with the terms of Plaintiffs' Plans and their

fiduciary duties, and determine that the pharmacy should charge and collect only the amount that

the pharmacy would receive for filling the prescription. Instead, Defendants exercised discretion to impose significant mark-ups—for example, $███ more than Plaintiff Sohmer's rightful $███ fee, $████ more than Plaintiff Hawks's rightful $███ fee, and $███ more than Plaintiff Fellgren's rightful $███ fee—and required the pharmacy to collect that excessive amount from Plaintiffs.

13.    Defendants violated the Plans—and, with respect to the ERISA Plans, breached their ERISA fiduciary duties—by exercising their discretion to secretly determine that patients must pay inflated copayments, coinsurance, and deductible payments and then directing pharmacies to collect those inflated copayments, coinsurance, and deductible payments on their behalf (which Overcharges were then either retained by the pharmacies or remitted to Defendants in the form of Clawbacks).

14.    Defendants misrepresented to Plaintiffs and the Class the cost-sharing amounts under the Plans and that their cost-sharing amounts were based on the amount that the pharmacy agreed to accept for the drugs, when, in fact, patients were charged and paid more than that amount and were charged based on inflated "costs."

15.    By engaging in the conduct described above, Defendants violated ERISA's fiduciary duties and engaged in prohibited transactions; utilized the U.S. Mail and interstate wire facilities to engage in their fraudulent billing scheme in violation of RICO; and, with respect to the non-ERISA Plans, Defendants violated the Plans and their implied covenant of good faith and fair dealing.

16.    In order to implement Defendants' fraudulent Overcharge scheme, Defendants' and/or Optum's contracts with participating pharmacies required the pharmacies not to disclose the existence of the Overcharges or Clawbacks, or the fact that a patient could, in certain

circumstances, pay less for a prescription drug than if the patient did not use a Defendant-administered Plan or did not have any insurance at all. As a result of these "gag clauses," the Overcharges remain hidden from participants and beneficiaries.

17.    Defendants' fraudulent scheme to artificially inflate the costs for medically necessary prescription drugs by overcharging patients, and then to surreptitiously require pharmacies to collect Overcharges or to take Clawbacks is inconsistent with the purposes of the health care system. For one, patients are paying higher amounts than they otherwise would have paid had Defendants not artificially inflated the payment amounts. Patients are supposed to save money through the use of pharmacy benefits, but in reality, they are charged excessive amounts.

18.    Indeed, the very purpose of obtaining or participating in a health plan that includes pharmacy benefits is to enable patients to benefit from the administrator's and PBM's negotiating and buying power with prescription drug manufacturers and pharmacies. This should result in *reduced* costs for prescription drugs. Patients and Plans also pay substantial costs and fees, which should cover the other aspects of the prescription drug plans, including their administration. Moreover, PBMs and Plan providers such as Defendants are paid significant fees as compensation for their services that are entirely separate from the Clawbacks, making the Clawbacks excess, undisclosed profit in exchange for little to nothing. Accordingly, Plaintiffs should not have been charged additional secret Overcharges and Clawbacks.

19.    As a result of Defendants' fraudulent scheme to collect Overcharges, Defendants overcharged Plaintiffs and the Class for prescription drugs during the Class Period (defined below). Defendants' misconduct has caused Plaintiffs and the Class to suffer significant damages. Plaintiffs seek relief by bringing the following claims:

(a)      With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce her rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan. Defendants violated the ERISA Plans by instructing pharmacies to charge Overcharges and take Clawbacks and they should not be allowed to continue to do so.

(b)      Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable and prohibits transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers. In setting the amount of and taking excessive undisclosed Overcharge compensation and Clawbacks, Defendants allowed and received unreasonable compensation and misused the assets of the ERISA Plans, including Plan and employer contributions under coinsurance Plans and the Plan contracts, which provided Defendants with the ability and discretion to extract these funds from patients.

(c)      Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In directing pharmacies to charge Overcharges, determining the amounts thereof, and taking Clawbacks for their own accounts, Defendants dealt with the assets of the Plans in their own interest, acted on behalf of parties whose interests are adverse to the interests of the Plans (including each other), and received consideration for their own accounts from parties dealing with the Plans in transactions involving the assets of the Plans.

(d)     Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (3) in accordance with Plan documents. By directing pharmacies to charge Overcharges, determining the amounts thereof, and in taking Clawbacks for their own accounts, Defendants (i) acted in their own interests rather than solely in the interest of Plaintiffs Sohmer and Hawks and the ERISA Subclass; (ii) failed to act for the exclusive purpose of providing Plan benefits and defraying Plan expenses; (iii) failed to act with the care, skill, prudence, and diligence that ERISA requires; and (iv) failed to act in accord with Plan documents.

(e)     With regard to RICO, under Count V, Defendants have engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary prescription drugs alleged below and are liable to Plaintiffs and the Class for all statutory remedies.

(f)     With regard to state law claims, under Count VI, Defendant United HealthCare Services has breached its contracts with Plaintiff Fellgren and the State Law Subclass members in requiring them to pay fees for prescriptions drugs in excess of the fees authorized in the Plans, including Overcharges and Spread.

(g)     Likewise, under Count VII, Defendant United HealthCare Services has breached its implied covenant of good faith and fair dealing in requiring Plaintiff Fellgren and the State Law Subclass members to pay Overcharges. Defendant United HealthCare Services's

actions were performed in bad faith, with the intent of maximizing its own revenue at participants' expense, in contravention of the reasonable expectations of Plaintiff Fellgren and the State Law Subclass members.

20.     As further alleged below, Plaintiffs seek to represent a nationwide Class of all plan participants and beneficiaries whose health Plans are managed or administered by Defendants.

## JURISDICTION

21.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and RICO; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

22.     **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process. Upon information and belief, Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Connecticut. Defendants may be found in this District and conduct substantial business herein: Defendants are authorized to do business in the State of Connecticut; Defendants conduct business in the State of Connecticut; Defendants have sufficient minimum contacts with the State of Connecticut; Defendants administer health plans from the State Connecticut; and/or Defendants otherwise intentionally avail themselves of the markets in the State of Connecticut through the marketing and sale of health care related services in this State so as to render the

exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.      **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants' address under the Plans is in Hartford, Connecticut, and because a substantial part of the events giving rise to the claims herein occurred within this District and/or a substantial part of property that is the subject of the action is situated in this District. Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because Defendants are found, have agents, or transact their affairs in this District.

## THE PARTIES

24.      Plaintiff Samantha Sohmer ("Plaintiff Sohmer") is a citizen of New Jersey. Plaintiff Sohmer received prescription drug coverage under a "Choice Plus Plan A" group Plan purchased through her employer for her benefit.  This Plan is a welfare benefit plan subject to ERISA.  The Plan was serviced and administered by Defendant United HealthCare Services, Inc. Under the Plan, Plaintiff Sohmer was obligated to pay copayments of $15-$175 for prescription drugs. On numerous occasions detailed below, Plaintiff Sohmer was charged a copay in an amount that exceeded the amount the pharmacy agreed to pay. As a result of Defendants' scheme, Plaintiff Sohmer has been injured by paying inflated amounts for medically necessary, covered prescription drugs.

25.      Plaintiff Stephen Hawks ("Plaintiff Hawks") is a Missouri citizen and was a participant in the Plan JTU (Silver) and the Plan SA201 (Silver), both of Hallmark Cards, Inc. Hawks's Plans were employee benefit plans subject to ERISA offered and underwritten by

- 11 -

Defendant United HealthCare Insurance Company. Under his Plans, Plaintiff Hawks was required to pay flat copayments of between $10 and $60.  On numerous occasions detailed below, Plaintiff Hawks was charged a copay in an amount that exceeded the amount the pharmacy agreed to pay. As a result of Defendants' scheme, Plaintiff Hawks has been injured by paying inflated copays for medically necessary, covered prescription drugs.

26.      Plaintiff Kathy L. Fellgren is a Florida citizen and was a participant in the School District of Escambia County, Florida Choice HRA Base Plan with Medical and Pharmacy coverage. The Plan was administered by Defendant United HealthCare Services, Inc. Under her Plan, Plaintiff Fellgren was obligated to pay copayments of $10, $30, or $70. On numerous occasions detailed below, Plaintiff Fellgren was charged a copay in an amount that exceeded the amount the pharmacy agreed to pay. As a result of Defendants' scheme, Plaintiff Fellgren has been injured by paying inflated copays for medically necessary, covered prescription drugs.

27.      Defendant United HealthCare Services, Inc. ("Defendant United HealthCare Services") is a Minnesota corporation. According to Plaintiff Sohmer's and Fellgren's Plans, United HealthCare Services's office is at 185 Asylum Street, Hartford, Connecticut. United HealthCare Services provides health insurance plans for employers, individuals, and families throughout the United States, and manages and administers both ERISA Plans and non-ERISA Plans, including Medicare Advantage plans. United HealthCare Services administered Plaintiff Sohmer's and Plaintiff Fellgren's self-funded health coverage plans.

28.      Defendant United HealthCare Insurance Company ("Defendant United HealthCare Insurance") operates as a subsidiary of UHIC Holdings, Inc., which is a subsidiary of United HealthCare Services. United HealthCare Insurance is a corporation organized under the laws of Connecticut with a principal place of business in Hartford, Connecticut. United HealthCare

Insurance contracts on behalf of itself and its affiliates for the payment of healthcare services provided to a participating provider's patients. United HealthCare Insurance is the primary underwriter of insurance policies provided and administered by United HealthCare Services and its state-level subsidiaries and affiliates. Plaintiff Hawks's Plans were underwritten and administered by United HealthCare Insurance.

## SUBSTANTIVE ALLEGATIONS

### Health Insurance in the United States

29.     Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.

30.     Health insurance is paid for by a premium paid for medical and prescription drug benefits for a defined period, or through employer plans that either provide benefits by purchasing group insurance policies, or are self-funded but administered by health insurance companies and their affiliates. Premiums and contributions for coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers, or other institutions.

31.     If a Plan covers outpatient prescription drugs, the cost for prescription drugs is typically shared between the patient and the Plan. Such cost sharing can take the form of deductible payments, coinsurance payments, and copayments. In general, deductibles—to the extent they apply to prescription drug benefits—are the dollar amounts a patient pays during the benefit period (usually a year) before the Plan starts to make payments for drug costs. Coinsurance generally requires a patient to pay a stated percentage of drug costs. Copayments are payments made by a patient toward the cost of a prescription drug and often are either set dollar amounts (*e.g.*, $10 or $15) or the actual pharmacy charge for the drug.

**The Pharmaceutical Benefits Industry and Pharmacy Benefits Managers**

32.     The pharmacy benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers, and health plan participants and beneficiaries.

33.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which in turn sells the drugs to a retail pharmacy. Payments for the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer. The retail pharmacy then distributes drugs to patients from its inventory. Neither the PBM nor the insurer/administrator is involved in the distribution of prescription drugs by the retail pharmacies, although PBM's may operate mail-order businesses.

34.     The retail payment side of the market for drugs is largely directed and controlled by insurance companies and their contracted or owned PBMs. In most instances where a health plan provides for prescription drug benefits, a PBM is the agent of the insurer/administrator hired to participate in administering the prescription drug component of a health plan. For example, Optum acted as Defendants' delegee in participating in administering Defendant-administered prescription drug plans during the Class Period.

35.     PBMs like Optum reach contractual agreements with retail pharmacies regarding the total prices pharmacies will receive (the combined amounts paid by patients and their Plans) for drugs processed through the PBM, typically a percentage of an industry-standard pricing benchmark ("Negotiated Price").

36.     When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is input into the pharmacy computer and transmitted via interstate wire to a "switch" that then directs the information to the correct PBM.

Accordingly, the pharmacy instantaneously submits the claim to Defendants on behalf of the patient. The prescription is supposed to be processed by the PBM in accordance with a patient's Plan including terms related to the amount of cost-sharing payments a patient must pay in exchange for the prescription benefit, which, as alleged herein, did not occur. The PBM then electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the cost-sharing amount the pharmacy must charge to and collect from the patient as a copayment, coinsurance, or the amount to be paid toward a deductible.

37.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy above and beyond the cost sharing payment (whether a copayment, coinsurance or deductible amount paid by the patient), to total the Negotiated Price. These amounts are aggregated and supposed to be paid to the pharmacy approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

38.     Under Defendants' scheme, if the patient's cost-sharing payment is greater than the amount the pharmacy has agreed to accept, there will be a "negative reimbursement" to the pharmacy for the difference between the patient's payment and the amount the pharmacy receives. The "negative reimbursement" is paid by the pharmacy to Defendants as part of the reconciliation every two weeks.

**The Relevant Contractual Relationships**

39.     Contractual relationships exist at three relevant levels: (1) between the employer (or, in the case of non-employer sponsored plans, the individual) and the company that underwrites and/or administers the plan; (2) between the insurer/administrator and the PBM; and (3) between the PBM and retail pharmacies. An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a health insurance company to

provide prescription drug benefits for its employees under health plans. Health insurance companies hire PBMs to manage the prescription drug benefits offered pursuant to their policies and administrative services only ("ASO") contracts. PBMs like Optum then have relationships with retail pharmacies, which govern, among other things, the Negotiated Prices that the pharmacies will be paid in exchange for drug purchases processed through the PBMs. Some pharmacies may be "in-network" and others may be "out of network."

40.     The following diagram represents (in simplified form) the contractual relationships among the parties:



41.     **Employer/Individual–Insurer/Administrator Agreements (*i.e*., Health Plans).** Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain prescription drug benefits. Plaintiffs and the Class members are intended beneficiaries of such agreements and they are participants and beneficiaries in the plans.

42.     **Insurer–PBM Agreements**. Health insurance/administration companies, such as Defendants, contract with and/or own PBMs such as Optum, which act as their agents in administering the prescription drug benefits purchased through the health plans that the insurers issue or administer.

43.     **PBM–Pharmacy Agreements**. For "in-network" benefits at issue in this case, PBMs contract with pharmacies, which serve as providers in the insurers/administrators'

pharmacy network. Pursuant to these agreements, the pharmacies fill prescriptions that are health

benefits covered under the Plans in exchange for an amount pursuant to the contract with the

PBM (the Negotiated Prices). Pursuant to these agreements, the pharmacy submits a claim to the

PBM on behalf of the patient. In response to this claim, pursuant to these agreements, Defendants

exercise ongoing discretionary control as they dictate the cost-sharing amount that a pharmacy

must charge and collect from a patient for a prescription drug, including the Overcharge, the

amount the pharmacy will be paid for filling the patient's prescription, and the amount of the

patient's payment that the pharmacy must send back to Defendants as a Clawback. The pharmacy

has no role in setting the amount of the patient's payment or Overcharge and thus must collect

and remit to Defendants the amount overcharged as determined by Defendants in their sole

discretion.

44.    The relationship among the parties is shown graphically as follows:



45.    Pursuant to the health plans, an insurer must ensure that, when it contracts with

and directs a PBM to act as its agent to manage prescription drug benefits, the PBM follows the

plans' terms, including when dictating to pharmacies the amounts to charge patients in cost-

sharing payments. In other words, insurers and administrators must ensure that PBMs do not overcharge patients for their prescription drug benefits.

46.     On the contrary, PBMs, acting as agents and/or in concert with Defendants, routinely require that patients pay substantially higher prices for prescription drugs than are allowed under the plans. As alleged herein, Defendants engaged in such practices with respect to Plaintiffs' Plans and the Class by charging Overcharges.

## Plaintiffs' Plans

47.     Defendant United Healthcare Services was the "Claims Administrator" for Plaintiff Sohmer's 2012-2015 and 2016 Plans. It had the responsibility "to handle the day-to-day administration of the Plan's coverage as directed by the Plan's Administrator, through an administrative agreement" between the plan sponsor and United Healthcare Services.

48.     Defendant United Healthcare Insurance was the underwriter and plan administrator for Plaintiff Hawks's 2015 and 2016 Plans. United Healthcare Insurance "share[d] responsibility for administering the plan" with the plan sponsor.

49.     Defendant United Healthcare Services was the "Claims Administrator" for Plaintiff Fellgren's self-funded employee health benefit plan in effect as of 2013. United Healthcare Services "provide[d] certain claim administration services for the Plan," including prescription drug benefit claims.

50.     As Plan administrators, Defendants had a number of responsibilities. In particular, they arranged for healthcare providers, including pharmacies, to participate in their network. Network pharmacies contracted with Defendants, or their designees and affiliates, to provide "Prescription Drugs Products" to Plaintiffs.

51.     According to the Plans, Defendants had the option to retain and utilize their affiliates to provide claims administration services. Affiliates "are those entities affiliated with the

- 18 -

Claims Administrator through common ownership or control with the Claims Administrator or with the Claims Administrator's ultimate corporate parent, including direct and indirect subsidiaries." Optum is a wholly owned subsidiary of Defendants and, therefore, an affiliate of Defendants.

52.    Defendants designated Optum entities to participate in providing prescription drug products to Plaintiffs under their Plans, including arranging for and managing the prescription drug network and managing and processing prescription drug claims on Defendants' behalf.

53.    Plaintiffs had two different types of Plans during the Class Period: those with a "lower of two" formula for determining the amount Plaintiffs pay for prescription drugs, and those with a "lowest of three" formula. Despite this distinction, as described below, *both* types of Plans precluded Defendants from charging cost-sharing payments that exceeded the price pharmacies agreed to be paid, and thus *both* types of Plans precluded the collection of Overcharges and, by necessary implication, the payment of Clawbacks.

54.    Plaintiff Sohmer's Plan effective January 1, 2016, Plaintiff Hawks's Plan effective January 1, 2015, and Plaintiff Fellgren's Plan effective January 1, 2013 were all "lowest of three" Plans. Under these Plans, Plaintiffs were responsible for paying the lowest of (1) the applicable copayment, (2) the network pharmacy's usual and customary charge, *i.e.*, the amount charged to a patient without insurance, or (3) the "Prescription Drug Charge,"[5] defined as the rate that Defendants agreed to pay the network pharmacy, including any applicable dispensing fee and taxes ("the Negotiated Price"). Under the "lowest of three" Plans, Plaintiffs should never pay more than the Negotiated Price.

---

[5] Plaintiff Fellgren's Plan used the term "Prescription Drug Cost," which is used and defined the same way as "Prescription Drug Charge." Plaintiffs use the term "Prescription Drug Charge" here for the sake of clarity.

55.     The same is true for "lower of two" Plans, including Plaintiff Sohmer's Plan in effect in from 2012 to 2015 and Plaintiff Hawks's Plan in effect in 2016. Under these Plans, Plaintiffs were responsible for paying the lower of (1) the applicable copayment or (2) the network pharmacy's usual and customary charge. As with the "lowest of three" Plans, Plaintiffs never should have paid more than the Negotiated Price because the copayment was expressly limited to the Negotiated Price.

56.     "Lower of two" Plans provided coverage for Eligible Expenses incurred in connection with obtaining Covered Health Services, including prescription and drug benefits.  For products and services provided by in-network providers, "Eligible Expenses" are the "contracted fees with the network provider"—*i.e.*, the Negotiated Price.[6]

57.     Both Plaintiff Sohmer's and Plaintiff Hawks's "lower of two" Plans provided that, when they received Covered Health Services such as prescription drug benefits from Network providers, they were "not responsible for any difference between the Eligible Expenses and the amount the provider bills."

58.     Because Eligible Expenses were "the contracted fees with a network provider," *i.e.*, the Negotiated Price, Plaintiffs in "lower of two" plans never should have paid more than that amount for prescription drugs.

59.     The "lower of two" Plans specifically defined "copayment" as the amount "you are required to pay for certain Covered Health Services." The Plans further stated that, "for Covered Health Services, you are responsible for paying the lesser of the following: The applicable Copayment [or] The Eligible Expense." Because the Eligible Expense was the Negotiated Price,

---

[6] A "network provider" is a "provider of healthcare services" that has a "participation agreement (either directly or indirectly) with [Defendants] or [Optum] to participate in [Defendants'] Network[.]"

Plaintiffs were not required to pay more than the Negotiated Price for prescription drugs even where the stated copayment amount was higher.

## Defendants' Plans Have Standard Terms

60.    Defendants use uniform prescription drug plan terms in their Plan contracts to provide prescription drug coverage. These terms of the Plans—and more importantly how these Plans are administered and managed by Defendants—do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class, regardless of the funding arrangement underpinning the health Plan benefits that Defendants offer and administer.

## Plaintiffs' Purchases[7]

61.    During the time that Plaintiff Sohmer was covered by the Plans, she purchased prescription drugs for which she was required to make copayments in excess of the amounts provided for by her Plans, including, for example, the following specific purchases:

---

[7] The prescription purchase data described herein has been modified to remove drug names to protect Plaintiffs' privacy and, at times, to hide irrelevant columns for the sake of clarity.

| Date | Amount UnitedHealth agreed to pay pharmacy | Plaintiff actually paid | Overcharge that was clawed back |
|---|---|---|---|
| 03/18/2015 | | $15.00 | |
| 03/23/2015 | | $15.00 | |
| 04/20/2015 | | $15.00 | |
| 05/26/2015 | | $15.00 | |
| 06/21/2015 | | $15.00 | |
| 06/21/2015 | | $15.00 | |
| 07/18/2015 | | $15.00 | |
| 07/23/2015 | | $15.00 | |
| 08/22/2015 | | $15.00 | |
| 09/20/2015 | | $15.00 | |
| 01/16/2016 | | $15.00 | |
| 01/20/2016 | | $15.00 | |
| 01/20/2016 | | $15.00 | |
| 02/10/2016 | | $15.00 | |
| 02/10/2016 | | $15.00 | |
| 02/14/2016 | | $15.00 | |
| 03/23/2016 | | $15.00 | |
| 04/24/2016 | | $15.00 | |
| 05/05/2016 | | $5.09 | |
| 05/23/2016 | | $15.00 | |
| 06/20/2016 | | $15.00 | |
| 07/15/2016 | | $15.00 | |
| 07/17/2016 | | $15.00 | |
| 08/22/2016 | | $15.00 | |
| 08/22/2016 | | $15.00 | |
| 09/20/2016 | | $15.00 | |
| 10/11/2016 | | $15.00 | |
| 10/24/2016 | | $15.00 | |
| 10/24/2016 | | $15.00 | |
| 11/16/2016 | | $15.00 | |
| 12/21/2016 | | $15.00 | |

62.    Plaintiff Sohmer was illegally charged Overcharges for these prescription drugs in excess of the Negotiated Price. During this timeframe, Defendants then "clawed back" these Overcharges from Plaintiff Sohmer's pharmacy for the benefit of itself.

- 22 -

63.     Likewise, in 2015 and 2016, Plaintiff Hawks made a number of prescription drug purchases pursuant to his plan, several of which included Overcharges that were "clawed back" by Defendants.

64.     For example, on February 11, 2016 and on June 6, 2016, Plaintiff Hawks, pursuant to his plan, refilled Drug A at Price Chopper Pharmacy, a retail network pharmacy. On these dates Plaintiff Hawks paid a $30.00 copayment.

65.     On September 6, 2016 and on November 22, 2016, Plaintiff Hawks paid cash for Drug A at Price Chopper Pharmacy, instead of a copayment. On these dates Plaintiff Hawks paid only $███.

66.     Thus, as the below reproduction of Plaintiff Hawks's claims history indicates, he paid an Overcharge of $███ on at least February 11, 2016 and June 6, 2016:

| Date Filled | Drug | Quantity | Price | Copay |
|---|---|---|---|---|
| 2/11/2016 | Drug A 10MG TAB | 90 | $███ | $███ |
| 6/6/2016 | Drug A 10MG TAB | 90 | $███ | $███ |
| 9/6/2016 | Drug A 10MG TAB | 90 | $███ | ███ |
| 11/22/2016 | Drug A 10MG TAB | 90 | $███ | ███ |

67.     In the above examples, when Plaintiff Hawks paid the copayment charged by the pharmacy, his Plan paid ███. Plaintiff Hawks was not charged the lesser of the copayment, the usual and customary amount, or the Negotiated Price. Instead, and in violation of his Plan's terms and numerous laws, Plaintiff Hawks was charged the *greater* of those amounts: the ███ copayment. Defendants then "clawed back" the difference as profit, and Defendants were enriched at Plaintiff Hawks's expense.

68.     Plaintiff Fellgren was also subject to multiple Overcharges. For example, in 2016, she purchased Drug Z six times, paying an Overcharge for the drug on her last two purchases.

69.    Under Plaintiff Fellgren's Plan, there was a $200 annual prescription drug deductible. During the deductible phase, patients paid "Eligible Expenses," defined as the "contracted rates with th[e] provider." In other words, during the deductible phase, Plaintiff Fellgren was obligated to pay the Negotiated Price until she reached $200 in out-of-pocket expenses. At that point, she was eligible for benefits under her "lowest of three" formula, and she should still have paid no more than the Negotiated Price for a prescription drug.

70.    That did not happen, however. During the deductible phase, Plaintiff Fellgren paid $▮ per prescription for Drug Z. In September of 2016, Plaintiff Fellgren met her $200 prescription drug deductible. Then, in October and December of 2016, she paid a $10 copayment per prescription for Drug Z—over ▮ the Negotiated Price:

| | E | O | S | T | U | W | Y | Z |
|---|---|---|---|---|---|---|---|---|
| 1 | Filled Date | NDC Label Name | Submitted Usual And Customary | Ingredient Cost | Dispensing Fee | Patient Pay | Approved Ingredient Cost | Approved Dispensing Fee |
| 16 | 02/17/2016 | DRUG Z | | | | | | |
| 25 | 06/08/2016 | DRUG Z | | | | | | |
| 27 | 07/07/2016 | DRUG Z | | | | | | |
| 29 | 09/06/2016 | DRUG Z | | | | | | |
| 56 | 10/07/2016 | DRUG Z | | | | | | |
| 58 | 12/23/2016 | DRUG Z | | | | | | |

71.    Plaintiff Fellgren's Plan entitled her to pay the *lowest of* the applicable copayment ($10), the usual and customary charge ($▮ or $▮, as reflected in the chart above), or the Prescription Drug Charge ($▮). In violation of the Plan, Defendants required the pharmacy to collect the $10 copayment from her and clawed back the $▮ Overcharge.

**Administrative Exhaustion Confirms Overcharges and Reveals Additional Ones**

72.    On January 16, 2018, Plaintiffs' counsel sent Defendants a letter requesting administrative review of their Overcharge claims. On March 7, 2018, Defendants issued an initial decision denying Plaintiffs' claims. Notably, the March 7 letter makes clear that Defendants patently misread Plaintiff Fellgren's plan, calling it a "lessor [sic] of two" plan, when it was actually a "lowest of three" plan. Similarly, Plaintiff Sohmer's 2016 plan—also a "lowest of three" plan—was ignored and treated as a "lessor [sic] of two" plan. And while the March 7 letter purports to adjudicate Plaintiff Hawks's claims, it contains no logic or elaboration whatsoever as to Plaintiff Hawks.

73.    On March 12, 2018, Plaintiffs requested a first level appeal, maintaining their position that they paid Overcharges in violation of their Plans. The March 12 letter made clear that Plaintiffs sought to appeal Defendants' initial determination for multiple years of claims, regardless of whether Defendants chose to provide claims data to Plaintiffs for all relevant transactions. The March 12 letter also pointed out that Defendants had chosen to ignore Mr. Hawks's administrative claim entirely.

74.    Defendants ruled on Plaintiffs' first level appeals on April 11, 2018, as detailed below.

75.    Defendants denied Plaintiff Sohmer's first level appeal, stating that she was not entitled to reversal of her transactions because she had a "lower of two" Plan. Again, Defendants did not acknowledge that Plaintiff Sohmer's 2016 Plan was a "lowest of three" Plan, nor did they acknowledge that under a "lower of two" Plan, Plaintiff Sohmer was still entitled to the Negotiated Price. Defendants informed Plaintiff Sohmer that she could request a second level review if she was not satisfied with the outcome of her first level appeal.

- 25 -

76.     Defendants partially granted Plaintiff Hawks's first level appeal. Defendants determined that Plaintiff Hawks was not entitled to reversal of any of his 2016 transactions because he had a "lower of two" Plan at that time. Defendants did not acknowledge that under a "lower of two" Plan, Plaintiff Hawks was still entitled to the Negotiated Price. However, Defendants determined that Plaintiff Hawks *had been overcharged* with respect to seven of his 2015 transactions, when he had a "lowest of three" Plan, stating: "Hawks actually paid the relevant member responsibility amount, which was more than the contract price negotiated with the individual pharmacy." Defendants informed Plaintiff Hawks that he could request a second level hearing if he was not satisfied with the outcome of his first level appeal. Defendants thus admitted that they had engaged in improper Overcharges and Clawbacks as to at least some of Plaintiff Hawks's transactions.

77.     Defendants denied Plaintiff Fellgren's first level appeal, again erroneously stating that she was not entitled to reversal of her transactions because she had a "lower of two" Plan. In fact, as discussed above, Plaintiff Fellgren's Plan was a "lowest of three" Plan. Moreover, Defendants did not acknowledge that even under a "lower of two" Plan, Plaintiff Fellgren would still be entitled to the Negotiated Price. Defendants informed Plaintiff Fellgren that she could request a second level review if she was not satisfied with the outcome of her first level appeal.

78.     On April 24, 2018, Plaintiffs requested a second level appeal of their administrative claims.

79.     Plaintiff Sohmer's second level appeal was denied by letter on May 24, 2018, with Defendants affirming their previous determination that she was not entitled to reversal of any of her transactions and notifying her that she has the right to pursue a claim under ERISA § 502(a)(1)(B).

- 26 -

80.     Plaintiff Fellgren's second level appeal likewise was denied by letter on May 24, 2018, with Defendants once again erroneously stating that she had a "lessor [sic] of two" Plan and thus was not entitled to reversal of her transactions. She was informed of a right to sue if not satisfied with the result.[8]

81.     On May 18, 2018, Plaintiff Hawks was informed by letter that a second level hearing was scheduled for May 23, 2018. Defendants affirmed their position that Plaintiff Hawks was not entitled to reversal of any of his 2016 transactions but had been overcharged with respect to seven of his 2015 transactions, which were reversed.

82.     On May 24, 2016, Plaintiff Hawks's second level review of his 2015 and 2016 transactions was denied by letter, and he was informed that he had a right to sue under ERISA § 502(a)(1)(B).

83.     On May 30, 2018, Defendants' PBM OptumRx issued Plaintiff Hawks a check in the amount of $50.74. The check contained no detail as to which specific transactions had been overturned.

84.     When Plaintiff Hawks requested more information as to which transactions were reversed, his counsel received the following spreadsheet from Defendants' representative:

_____

[8] As further evidence of Defendants' lack of care in handling claims and appeals and communicating fully and accurately with plan participants, the May 24 letter misinformed Plaintiff Fellgren that she had a right to sue under ERISA § 502(a)(1)(B), but, on information and belief, hers is not an ERISA plan.

| | B | E | F | I | N | S | T | U | W | Y | Z | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Member Name | Filled Date | Claim Number | Claim Status Desc | GPI Label Name | Submitted Usual And Customary | Ingredient Cost | Dispensing Fee | Patient Pay | Approved Ingredient Cost | Approved Dispensing Fee | Approved Amount Paid |
| 2 | STEPHEN HAWKS | 02/28/2015 | 150592815619241 | Payable | DRUG A | $46.99 | $17.41 | $12.59 | $30.00 | $28.00 | $2.00 | $0.00 |
| 3 | STEPHEN HAWKS | 03/11/2015 | 150705534148247 | Payable | DRUG B | $54.99 | $9.09 | $30.91 | $40.00 | $9.09 | $1.35 | ($29.56) |
| 4 | STEPHEN HAWKS | 06/10/2015 | 151612805429257 | Payable | DRUG A | $50.99 | $17.41 | $12.59 | $30.00 | $17.41 | $2.00 | ($10.59) |
| 5 | STEPHEN HAWKS | 08/10/2015 | 152224951586208 | Payable | DRUG C | $69.51 | $23.19 | $6.81 | $30.00 | $23.19 | $2.00 | ($4.81) |
| 6 | STEPHEN HAWKS | 08/10/2015 | 152224951586208 | Reversed | DRUG C | ($69.51) | ($23.19) | ($6.81) | ($30.00) | ($23.19) | ($2.00) | $4.81 |
| 7 | STEPHEN HAWKS | 08/27/2015 | 152395109047242 | Payable | DRUG A | $50.99 | $17.41 | $12.59 | $30.00 | $17.41 | $2.00 | ($10.59) |
| 8 | STEPHEN HAWKS | 08/27/2015 | 152395109047242 | Reversed | DRUG A | ($50.99) | ($17.41) | ($12.59) | ($30.00) | ($17.41) | ($2.00) | $10.59 |
| 9 | STEPHEN HAWKS | 10/22/2015 | 152953069318214 | Payable | DRUG C | $69.51 | $23.19 | $6.81 | $30.00 | $23.19 | $2.00 | ($4.81) |
| 10 | STEPHEN HAWKS | 10/22/2015 | 152953069318214 | Reversed | DRUG C | ($69.51) | ($23.19) | ($6.81) | ($30.00) | ($23.19) | ($2.00) | $4.81 |
| 11 | STEPHEN HAWKS | 11/03/2015 | 153072619463258 | Payable | DRUG C | $69.51 | $23.19 | $6.81 | $30.00 | $23.19 | $2.00 | ($4.81) |
| 12 | STEPHEN HAWKS | 11/03/2015 | 153072619463258 | Reversed | DRUG C | ($69.51) | ($23.19) | ($6.81) | ($30.00) | ($23.19) | ($2.00) | $4.81 |

85.    Four of the seven transactions had been reversed at the pharmacy, as indicated by the "Claim Status Description," column I, and the negative amounts in red (rows 5-12). As such, Defendants did not reimburse Plaintiff Hawks for those purchases.

86.    On appeal, Plaintiff Hawks was reimbursed for the other three transactions (rows 2-4), in the amount of $10.59 each for the two Drug A purchases and $29.56 for the single Drug B purchase:



Gretchen,
In follow-up to the below and in response to your questions, the total refund amount to Mr. Hawks is $50.74. This is broken down by claim as follows:

Claim #
150592815619241: $10.59
150705534148247: $29.56
151612805429257: $10.59


Michelle S. Grant
Partner

DORSEY
always ahead

87.    As can be seen in the spreadsheet provided by Defendants, Plaintiff Hawks paid a copayment of either $30 or $40 for each of the three reversed transactions, and in each case, the copayment was lower than the usual and customary charge as set forth in column S:

| | B | E | F | I | N | S | T | U | W | Y | Z | AC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Member Name | Filled Date | Claim Number | Claim Status Desc | GPI Label Name | Submitted Usual And Customary | Ingredient Cost | Dispensing Fee | Patient Pay | Approved Ingredient Cost | Approved Dispensing Fee | Approved Amount Paid |
| 2 | STEPHEN HAWKS | 02/28/2015 | 150592815619241 | Payable | DRUG A | $46.99 | $17.41 | $12.59 | $30.00 | $28.00 | $2.00 | $0.00 |
| 3 | STEPHEN HAWKS | 03/11/2015 | 150705534148247 | Payable | DRUG B | $54.99 | $9.09 | $30.91 | $40.00 | $9.09 | $1.35 | ($29.56) |
| 4 | STEPHEN HAWKS | 06/10/2015 | 151612805429257 | Payable | DRUG A | $50.99 | $17.41 | $12.59 | $30.00 | $17.41 | $2.00 | ($10.59) |

88.     As Defendants *admitted* by reversing the transactions, Plaintiff Hawks paid an Overcharge because he was entitled to the Negotiated Price.

89.     Given the amount Plaintiff Hawks was reimbursed, one can determine the Prescription Drug Charge for Drugs A and B. For Drug A, it was $19.41, or $10.59 less than the $30 copayment he paid. For Drug B, it was $10.44, or $29.56 less than the $40 copayment he paid.

90.     Although Defendants admitted wrongdoing in reversing Plaintiff Hawks's Overcharges, they have not done so uniformly, even as to the named Plaintiffs. First, despite the fact that Plaintiffs Hawks has the same Plan language as Plaintiffs Sohmer and Fellgren, and despite the fact that the transaction data for Plaintiffs Sohmer and Fellgren shows that they too paid more than the Negotiated Price on multiple occasions, Defendants denied Plaintiff Sohmer's and Plaintiff Fellgren's administrative appeals in their entireties.

91.     Moreover, Defendants refused to reverse Plaintiff Hawks's 2016 transactions where he overpaid the same amount for the very same drug:



| | Member Name | Filled Date | Claim Status Desc | GPI Label Name | Submitted Usual And Customary | Ingredient Cost | Dispensing Fee | Patient Pay | Approved Ingredient Cost | Approved Dispensing Fee | Approved Amount Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 29 | STEPHEN HAWKS | 02/28/2015 | Payable | DRUG A | | | | | | | |
| 31 | STEPHEN HAWKS | 02/11/2016 | Payable | DRUG A | | | | | | | |
| 32 | STEPHEN HAWKS | 06/06/2016 | Payable | DRUG A | | | | | | | |

Highlighted here is the 2015 transaction reversed by Defendants; with respect to the other two, Defendants maintain they are not Overcharges because Plaintiff Hawks's Plan changed from "lowest of three" to a "lower of two" in 2016. But, as discussed above, Plaintiff Hawks's 2016 Plan entitled him to pay the Negotiated Price. Thus, these 2016 transactions on February 11 and June 6 likewise constitute Overcharges for which Plaintiff Hawks is entitled to reversal. Plaintiff Hawks alleges these Overcharges on February 11 and June 6 not only because of the lower cash price ($█████) he paid for these same drugs on September 6 and November 22, *see supra* ¶ 66, but

also in light of further data—specifically, the reversal of his February 28, 2015 Drug A

transaction, as described here—provided by Defendants in the course of adjudicating his

administrative claim and appeal.

92.    Plaintiff Hawks also had 2016 transactions for another drug, Drug C, that, upon

information and belief, show similar Overcharges as Drug A:



93.    Plaintiff Fellgren likewise had multiple prescription drug purchases that show

similar cost manipulation as Plaintiff Hawks's Drug A purchases and thus represent Overcharges,

including the following examples, which include the examples from October 7, 2016 and

December 23, 2016 discussed *supra* ¶ 70, as well as many others:



| | Filled Date | NDC Label Name | Submitted Usual And Customary | Ingredient Cost | Dispensing Fee | Patient Pay | Approved Ingredient Cost | Approved Dispensing Fee |
|---|---|---|---|---|---|---|---|---|
| 13 | 03/30/2015 | DRUG T | | | | | | |
| 16 | 04/19/2015 | DRUG T | | | | | | |
| 19 | 05/12/2015 | DRUG T | | | | | | |
| 26 | 05/26/2015 | DRUG T | | | | | | |
| 27 | 06/08/2015 | DRUG T | | | | | | |
| 28 | 06/13/2014 | DRUG T | | | | | | |
| 29 | 06/29/2014 | DRUG T | | | | | | |
| 54 | 07/15/2015 | DRUG T | | | | | | |
| 55 | 07/18/2014 | DRUG T | | | | | | |
| 68 | 07/26/2015 | DRUG T | | | | | | |
| 72 | 08/06/2015 | DRUG T | | | | | | |
| 73 | 08/09/2014 | DRUG T | | | | | | |
| 74 | 09/08/2015 | DRUG T | | | | | | |
| 99 | 09/11/2014 | DRUG T | | | | | | |
| 100 | 09/18/2015 | DRUG T | | | | | | |
| 103 | 10/05/2015 | DRUG T | | | | | | |
| 118 | 10/09/2014 | DRUG T | | | | | | |
| 119 | 10/24/2015 | DRUG T | | | | | | |
| 120 | 10/28/2014 | DRUG T | | | | | | |
| 121 | 11/03/2015 | DRUG T | | | | | | |
| 122 | 11/21/2015 | DRUG T | | | | | | |
| 123 | 11/26/2014 | DRUG T | | | | | | |
| 124 | 12/05/2015 | DRUG T | | | | | | |
| 125 | 12/14/2015 | DRUG T | | | | | | |
| 126 | 12/23/2014 | DRUG T | | | | | | |
| 127 | 12/23/2016 | DRUG T | | | | | | |
| 128 | 04/27/2015 | DRUG U | | | | | | |
| 131 | 12/06/2015 | DRUG V | | | | | | |
| 132 | 12/15/2015 | DRUG V | | | | | | |
| 133 | 03/13/2015 | DRUG W | | | | | | |
| 134 | 08/24/2015 | DRUG X | | | | | | |
| 136 | 12/12/2016 | DRUG X | | | | | | |
| 140 | 12/12/2016 | DRUG Y | | | | | | |
| 142 | 06/16/2015 | DRUG Z | | | | | | |
| 146 | 10/07/2016 | DRUG Z | | | | | | |
| 148 | 12/23/2016 | DRUG Z | | | | | | |

**Patients Covered By Defendants' Health Plans Pay Undisclosed,**
**Unauthorized and Excessive Fees for Prescription Drugs**

94.    Defendants have engaged in a scheme to charge Plaintiffs and other patients

Overcharges in violation of the Plans as alleged above. This is particularly true for many low-

cost, high-volume generic prescription drugs.

95.    Defendants utilize technology and service platforms, retail network contracting

and claims processing services to carry out this Overcharge and Clawback Scheme, including

those of Optum.

96.    Defendants' PBM OptumRx's Provider Manual[9] explains the mechanism by which

Defendants conducted the scheme:

(a)    The Provider Manual "includes the policies and procedures" applicable to

all pharmacies participating in Optum's pharmacy network and "is incorporated into and is a part

of" the pharmacies' agreements with Defendants (through Optum).[10]

(b)    The Provider Manual provides that  Optum "shall communicate to

[pharmacies] (via the POS System) the Cost-Sharing Amounts (*e.g.*, Co-payment and Deductible)

applicable to Covered Prescription Services."[11]  Optum directs that pharmacies "shall collect the

full Cost-Sharing Amounts" from Plaintiffs and the Class members purchasing medically

necessary prescription drugs.[12]  Optum directs that pharmacies "must charge . . . the Cost-Sharing

Amount indicated in [Defendants'] online response and only this amount."[13]  Optum dictates that

---

[9]    OptumRx Provider Manual (2d ed. 2016) ("Provider Manual"), available at:
https://www.optum.com/content/dam/optum/resources/publications/Quarter2-4.1.16-
ORX5979A_160315_OptumRx2016PharmacyManual_FINAL.pdf.
[10] *Id.* at 3.
[11] *Id.* at 13.
[12] *Id.*
[13] *Id.* at 54.

waiving the Cost-Sharing Amount by pharmacies is "strictly prohibited . . . and is considered a material breach of the Agreement."[14]

(c)    The Provider Manual provides that "reimbursement pricing information, as well as prices paid to [pharmacies] . . . are "confidential and proprietary. . . ."[15]

(d)    The Provider Manual provides that "[f]ailure to adhere to any of the provisions . . . which includes this [Provider Manual] . . . will be viewed as a breach of the Agreement."[16] Pharmacies are "subject to penalties or sanctions" if  Optum determines that the pharmacies "disclosed confidential information. . . ."[17] These penalties include "at a minimum . . . $5,000 per incident," and pharmacies "may be subject to additional actions" by Optum, "up to termination from participation" in Optum's pharmacy network.[18] Pharmacies terminated from participation in the pharmacy network are banned from the pharmacy network for five years and, only after such a period, may apply for reinstatement at Optum's "sole discretion."[19]

97.    Defendants used the Optum platforms to create and implement their unlawful Overcharge Scheme. Defendants exercised their discretion to program and manipulate the Optum technology and service platforms to violate the Plans' term and charge greater Cost-Sharing Amounts than the Plans permitted, and they exercised they discretion to input the excessive and unlawful cost-sharing data into the platform system to enable the system to overcharge patients.

98.    Defendants further used their discretion to manipulate the systems to misrepresent to patients the "Cost-Sharing Amounts (*e.g.*, Co-payment, Coinsurance and Deductible)

---

[14]    *Id.*
[15]    *Id.* at 54.
[16]    *Id.* at 3.
[17]    *Id.* at 40.
[18]    *Id.*
[19]    *Id.* at 97.

- 33 -

applicable to Covered Prescription Services" that were inflated, false and in violation of the Plans. Defendants required the pharmacies to make these misrepresentations to Plaintiffs and other patients when they filled their prescriptions. For example, Defendants made these misrepresentations to Plaintiffs each time they filled a prescription and were advised of and required to pay an excessive Copayment and Spread as alleged above.

99.    Defendants further exercised their discretion to direct that pharmacies "shall collect the full [inflated and unlawful] Cost-Sharing Amounts" from patients.[20] Defendants required that pharmacies "must charge . . . the Cost-Sharing Amount indicated in [Optum's] online response and only this amount,"[21] which included the excessive and unlawful Overcharges in violation of the Plans that Defendants exercised their discretion to improperly input into the system.

100.    Where the patient pays a deductible and/or coinsurance (not a copayment), the patient is overcharged because his or her payment is based on the inflated amount, ***not*** the lower amount paid to the pharmacy. Defendants implemented the scheme concerning these types of cost-sharing in the same way they executed the scheme concerning copayments.

101.    Defendants' Overcharge Scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the misrepresentation in the Plans that Plaintiffs would pay a certain cost-share amount for prescription drugs with the knowledge and intent that patients would in fact be charged a higher amount; (b) the misrepresentation of the amount of the cost-sharing payment owed under the Plan terms when a patient purchased a drug; (c) the failure to disclose that a material portion of the "co-payments" were not "co-" payments at

---

[20]   *Id.* at 13.
[21]   *Id.* at 54.

all, but were unlawful Overcharges; (d) the failure to disclose that prescription drug payments under deductible portions of health insurance Plans were based on prescription drug prices that exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language; and (e) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language.

102.    On information and belief, some pharmacists were willing participants in the foregoing scheme while they were allowed to retain the Overcharges. However, once Defendants began "clawing back" the Overcharges (rather than allowing pharmacists to retain it), some pharmacists began attempting to alert customers to the existence of the Overcharges and Clawbacks. Defendants affirmatively blocked pharmacists from disclosing the existence of the Overcharges and Clawback scheme and from selling prescription drugs directly to customers for a lower price.

103.    For example, according to Doug Hoey ("Hoey") of the National Community Pharmacists Association ("NCPA"), a pharmacist sent him a letter received from Optum. Hoey stated that the letter from Optum " scolded the pharmacist," stating that Optum had "'recently discovered that pharmacy advised members that utilizing a cash price for their prescription is a better deal than using their insurance benefits.'"[22]  Optum further stated in the letter that "telling customers a cheaper price exists is a 'violation of the agreement,' [with ] Optum," that Optum 'takes these matters very seriously[,]' and that 'failure to timely comply with this notice could result in further disciplinary action, up to and including termination from all Optum pharmacy networks.'" *Id.*

---

[22] *See* Lee Zurik, As United overcharges customers, execs earn tens of millions in stock, FOX8LIVE.COM (July 18, 2016, 11:10 PM), http://www.fox8live.com/story/32472327/ zurikasUnitedoverchargescustomersexecsearntensofmillionsinstock (last visited July 26, 2018).

104.     Indeed, a June 28, 2016 press release issued by the NCPA described the "Clawback" practice and how it was impacting pharmacists and consumers throughout the United States.[23] The press release went on to discuss a survey that was conducted by the NCPA of its members between June 2 and June 17, 2016, which disclosed the following:

- "Clawbacks" are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.

- Two-thirds (67 percent) said the practice is limited to certain PBMs.

- Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.

- Sometimes insurance companies and PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan. In other words, the patient has to affirmatively ask about pricing. Most pharmacists (59 percent) said they encountered these restrictions at least 10 times during the preceding month.[24]

105.     Some of the comments received from the pharmacists who responded to the survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

---

[23] News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited July 26, 2018); *see also* Survey of Community Pharmacies, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited July 26, 2018).
[24] *Id.*

\*\*\*

"Simvastatin 90-day charged the patient $30 more than cash price."

\*\*\*

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

\*\*\*

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

\*\*\*

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

\*\*\*

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[25]

106.    Clearly, these examples of Overcharges could not be possible if the true cost of the prescription drug was disclosed and the pharmacy was not prohibited by contract and threat of network termination from disclosing the lower cash price for these drugs.

107.    Clawback programs are becoming more and more commonplace in the insurance industry and have "the effect of duping average consumers of prescription drugs into unwittingly funding [corporate] profits."[26]

---

[25] *See* Community pharmacists describe PBM copay clawbacks on patients, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited July 26, 2018).
[26] Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM Compensation and Fee Disclosures (Aug. 20, 2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf.

108.    Lawmakers, customers, and pharmacists have all raised concerns that there is a dangerous lack of transparency, rendering it difficult to assess whether a plan is being administered in compliance with plan or contract terms.[27]

109.    Potential waste and abuse in the administration of these plans has not gone unnoticed by the Department of Labor — which has the authority to enforce ERISA. In response, the ERISA Advisory Council, established under ERISA, held a hearing in August 2014.

110.    At the hearing, the Council heard testimony regarding "a new PBM phenomenon, called 'clawback'" which takes advantage of the lack of transparency in the PBM industry According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy. The claim is processed and the pharmacist is instructed to collect $100 as the cost of the drug. The entire prescription is paid for by the patient. Two weeks later, when the pharmacist receives reimbursement from the PBM, his remittance statement shows that the PBM has taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make a few dollars profit on the claim. What happens to the $75 difference? The PBM retains this amount as "spread" paid for by the patient.[28]

### The Fox 8 Investigation

111.    The New Orleans television station FOX 8 investigated "Clawbacks" as part of its Medical Waste investigative series. FOX 8's investigative reporter, Lee Zurik, found that insurance companies were "charging co-pays that exceed the customers' costs for the drug," and that insurers were "clawing back" the excess payments from the customers.

112.    FOX 8 published a number of screenshots from a pharmacist's computer system showing, with respect to particular drugs, the amount of the payment that certain insurer/administrators (including Defendant) required pharmacists to collect from customers and

---

[27] National Community Pharmacists Association, Lawmakers Ask Medicare for More Drug Payment Transparency (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.
[28] Hayes, supra note 26 at 7.

the amount the pharmacists were required to pay to the health insurer/administrators as a "Clawback."

113.    As part of its investigation, Mr. Zurik requested comment from Defendants. Notwithstanding the specific provisions in the contract Defendants imposed on pharmacies that barred pharmacists from disclosing the existence of the Overcharges to customers (as detailed above), Defendants' representative falsely claimed that "we encourage people to ask questions of their pharmacists to ensure they are getting the lowest available price for their prescriptions:"



From: Burns, Matthew A <matt_burns@uhc.com>
Sent: Friday, July 22, 2016 8:46 PM
To: Zurik, Lee
Subject: RE: Part D story

Attribute to me:

Our goal is to help our members get the lowest available price for their prescriptions. Often the lowest price is their plan copay, other times it's our contracted rate with the pharmacy, and sometimes it's the pharmacy's own retail or discount price. Our plans offer members security and peace of mind, and we encourage people to ask questions of their pharmacists to ensure they are getting the lowest available price for their prescriptions.

114.    An Optum representative further stated to Mr. Zurik, falsely, that Optum ensures that "the customer pays the lowest amount possible within their plan" and that "there is no new charge for the consumer as a result of" Defendants' Overcharge and Clawback scheme, ignoring that the underlying Overcharges violated the Plan language and was illegal:



From:        Stearns, Matthew H <matt.stearns@optum.com>
Sent:        Thursday, May 05, 2016 8:51 PM
To:          Zurik, Lee
Subject:     RE: From Optum

Hey – last thing, to be clear: this program ensures the customer pays the lowest amount possible within their plan – there is no new charge for the consumer as a result of this program.

115.    The Optum representative also claimed that the Clawback "does not accrue to [Optum's] bottom line:"

> **From:** Stearns, Matthew H [mailto:matt.stearns@optum.com]
> **Sent:** Thursday, May 05, 2016 8:31 PM
> **To:** Zurik, Lee <lzurik@fox8live.com>
> **Subject:** RE: From Optum
>
> Thanks, Lee. Key point here is that this does not accrue to our bottom line.

On information and belief, this statement was false.

116.    In response to the disclosure of the "Clawback" practice, Louisiana Insurance

Commissioner, James J. Donelon stated: "You could say that, if the customer is paying more than

the drug is worth, it's not a copay — it's a 'you-pay.'"

117.    FOX 8 also found that pharmacists were required to charge customers the amount

dictated by the insurer or PBM and were not allowed to give any discounts. According to Randal

Johnson, President and CEO of the Louisiana Independent Pharmacies Association, "it's actually

costing you more to acquire the drug with your insurance than you could if you walked in off the

street and you didn't have insurance."

118.    As a result of their deleterious impact on consumers, many states have now

outlawed the Overcharges, Clawbacks, and/or "gag" clauses alleged herein.

**"Clawbacks" Are Most Common With Widely Used Drugs**

119.    Defendants impose Overcharges and Clawbacks most frequently on widely used,

low-cost drugs, and particularly generic drugs, where the cost of the drug is relatively low. This

enables Defendants to impose deductible costs, copayments, and coinsurance costs that are higher

than the cost of the drug, thereby insuring for themselves a Clawback. These drugs include, but

are not limited to the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam,

Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol,

Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone,

Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Chlorzoxazon,

Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam,

Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone,

Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Ergocalciferol,

Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide,

Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin,

Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz,

Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus,

Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And

Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam,

Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin,

Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine,

Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin,

Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole,

Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone,

Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair,

SMZ/TMP, Sodium Chloride (1 gm), Sotalol HCL, Spironolactone, Sprintec, Sulfameth/Trimeth,

Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine,

Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin,

Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir,

Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra, Vigamox,

Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

**Defendants Are ERISA Fiduciaries**

120.    Plaintiffs Sohmer and Hawks and the members of the ERISA Subclass (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), administered by Defendants to provide participants with medical care and prescription medications ("ERISA Plans").

121.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."[29]  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

122.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is

---

[29] As an example of "named" fiduciary status arising from the uniform ASO contracts that Defendants use to administer self-insured health plans, according to section 5.1 of the Administrative Services Agreement between United HealthCare Services and Plaintiff Fellgren's employer, the employer "appoints United [HealthCare Services] a named, ERISA fiduciary under the Plan with respect to (i) performing initial benefit determinations and payment, (ii) performing the fair and impartial review of first level internal appeals. As such, Customer delegates to United [HealthCare Services] the discretionary authority to (i) construe and interpret the terms of the Plan, (ii) to determine the validity of charges submitted to United [HealthCare Services] under the Plan, and (iii) make final, binding determinations concerning the availability of Plan benefits under the Plan's internal appeal process." As such, United HealthCare Services was bound to provide notices of adverse benefit determination in accord with ERISA when administering ERISA plans.

required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

123.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

124.    Defendants are fiduciaries of all of the ERISA Plans for which they administered prescription drug benefits in that they *exercised* discretionary authority or control respecting the plan and plan asset management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they *had* discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Subclass, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii).

125.    Defendants **had** fiduciary authority over benefit administration under the ERISA Plans in that they operated and controlled the prescription drug benefits under the ERISA Plans as alleged herein.

126.    Defendants are also fiduciaries because they ***exercised*** fiduciary authority over plan management, in addition to ***having*** fiduciary authority over plan administration. By way of example, Defendants:

(a)    exercised discretion to violate the Plans to calculate and set the amount of and charge patients Overcharges;

- 43 -

(b)      had and exercised discretion to set up a computer system to process prescription drug claims and exercised discretion to program and input data into that system which they used to intentionally set the amount of Overcharges in violation of the Plans (*i.e.*, these were not unintentional miscalculations);

(c)      had and exercised discretion to dictate the amount of and require pharmacies to charge and collect the Overcharges, thereby establishing the amount of the Spread;

(d)      exercised discretion to require the pharmacies to remit some or all of the Overcharges to Defendants as Clawbacks;

(e)      exercised discretion to set their (and their affiliates') compensation for services performed as a fiduciary by dictating Spread and Clawbacks;

(f)      exercised discretion to unilaterally collect their own compensation for services performed by collecting Clawbacks;

(g)      exercised discretion to take Clawbacks of the Spread, despite the fact that they were not authorized to charge Spread or to take Clawbacks as additional compensation;

(h)      exercised discretion concerning whether to disclose Clawbacks;

(i)      exercised discretion to require pharmacies to misrepresent to patients the proper cost-sharing amounts and prevent pharmacies from disclosing to patients the proper cost-sharing amounts and the manner in which they charged for prescription drugs as alleged above;

(j)      exercised discretion to prohibit pharmacies from disclosing to patients the existence or amount of the Overcharges; and

(k)      exercised discretion to prohibit pharmacies from disclosing to patients that participants could purchase drugs at a price lower than the amount set by Defendants by not using their insurance or prescription benefits.

127.    In addition to their fiduciary status under the foregoing provisions, Defendants are fiduciaries in that they *exercised* authority or control respecting management or disposition of plan assets. The insurance and ASO contracts underpinning the Plans are "plan assets" within the meaning of ERISA, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Additionally, under coinsurance plans, the payments by the Plan and employers (and related trusts) for prescription drugs are plan assets. Defendants used their authority and control over these Plan assets and cost-sharing amounts to implement their Overcharge and Clawback scheme.

128.    Defendants exercised control over the amounts paid by both employers/trusts and participants/beneficiaries by dictating that pharmacies charge Overcharges, as alleged above. Defendants exercised control and authority over the insurance policies, ASO contracts, and PBM agreements in that they used these contracts—from which they derived discretion and control over plan prescription drug management and pricing—to implement the Overcharge scheme, as alleged above.

129.    In addition, Defendants were fiduciaries in exercising discretionary control and authority over the management and administration of the Plans to delegate to Optum some of their fiduciary duty to provide prescription drug services for the benefit of the ERISA Subclass. When Defendants endowed Optum with authority and discretion to control cost-sharing amounts to be paid by the ERISA Subclass, Defendants assumed the duty to monitor Optum's exercise of that discretionary authority. Defendants further owed and owe the ERISA Subclass the duty to establish policies and procedures to monitor Optum's performance of its duties, to monitor its prescription medication pricing, to monitor the effect of the Overcharge and Clawback Scheme described herein on the amount paid by the ERISA Subclass, to protect the interests of the ERISA

Subclass, to avoid the misuse of plan assets, and to provide complete and accurate information to the ERISA Subclass.

130.    Defendants are also parties in interest under ERISA because (a) they are fiduciaries, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) they provided insurance, plan administration, and/or pharmacy benefit management services to Plaintiffs' and the ERISA Subclass members' Plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

131.    Defendants' affiliates, including Optum, are also parties in interest because they provided pharmacy benefit management services to Plaintiffs' and the ERISA Subclass members' Plans. *Id.* As parties in interest, Defendants' affiliates, including Optum, received direct and indirect compensation for services, some of which was in the form of excess Clawback fees that were collected in exchange for few to no services.  These entities also received and used plan assets for the benefit of themselves to enable Defendants to impose their Overcharge and Clawback Scheme on the ERISA Subclass.

## Defendants' ERISA Duties

132.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

133.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty — that is, the duty to "discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to

participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of

interest and to resolve them promptly when they occur. A fiduciary must always administer a plan

with an "eye single" to the interests of the participants and beneficiaries, regardless of the

interests of the fiduciaries themselves or the plan sponsor.

134.   **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the

duty of prudence — that is, the duty "to discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims.

. . ."

135.   **The Duty to Inform.** The duties of loyalty and prudence include the duty to

disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative

duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a

duty to convey complete and accurate information material to the circumstances of participants

and beneficiaries.

136.   **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries

from certain acts because they are self-interested or conflicted and therefore become per se

violations of ERISA § 406(b)—or because they are improper "party in interest" transactions

under ERISA § 406(a). Under ERISA, a "party in interest" includes a fiduciary, as well as entities

providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14).

ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are

discussed above.

137.    ERISA § 406(a) provides that transactions between a plan and a party in interest

are prohibited transactions unless they are exempted under ERISA § 408:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect —

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

138.    ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not —

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

139.    **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>>
>> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

140.    **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee or delegatee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

141.    **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Further, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce

any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B), as further set forth below, because not all the remedies Plaintiffs seek are available under all sections of ERISA and, alternatively, Plaintiffs are pleading their claims in the alternative.

## Defendants Breached Their Fiduciary Duties

142.    Defendants breached the terms of the ERISA Plans, committed breaches of fiduciary duty, engaged in prohibited transactions, and harmed Plaintiffs Sohmer and Hawks and the ERISA Subclass members in the following ways:

      (a)    Defendants wrongfully charged Plaintiffs Sohmer and Hawks and the ERISA Subclass members excessive and unlawful copayments and Spread;

      (b)    Defendants wrongfully charged Plaintiffs Sohmer and Hawks and the ERISA Subclass members excessive and unlawful coinsurance payments in that, rather than charging a percentage of the amounts paid to the pharmacies for the dispensed drugs, the coinsurance payments were based on substantially inflated amounts;

- 50 -

(c)      Defendants wrongfully charged Plaintiffs Sohmer and Hawks and the ERISA Subclass members excessive and unlawful deductible payments in that rather than charging the lesser of the applicable per occurrence deductible fee or the amount paid to the pharmacy for the dispensed drug, Plaintiffs Sohmer and Hawks and the ERISA Subclass members were charged deductible fees that were higher;

(d)      Defendants wrongfully used a computer system and data they input into that system to charge patients unlawful Overcharges and dictate the excessive amounts pharmacies charged patients for prescription drugs;

(e)      Defendants wrongfully required pharmacies to charge patients unlawful Overcharges;

(f)      Defendants wrongfully required pharmacies to collect the unlawful Overcharges and pay Overcharges back to Defendants as Clawbacks;

(g)      Defendants wrongfully misrepresented to patients the proper cost-sharing amounts at the time patients filled their prescriptions and were charged by pharmacies;

(h)      Defendants misrepresented their cost-sharing terms, practices, and procedures in the Plan terms;

(i)      Defendants willfully failed to disclose to patients the proper cost-sharing amounts under the Plans and the manner in which they charged for prescription drugs;

(j)      Defendants wrongfully prohibited pharmacies from disclosing to patients the existence or amount of the Overcharges, including Spread, and Clawbacks;

(k)      Defendants wrongfully prohibited pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants;

(l)     Defendants wrongfully determined the amount of and collected additional unlawful undisclosed Clawback compensation;

(m)     Defendants violated the Plans' terms and instructed or allowed their service providers to violate Plan terms;

(n)     Defendants set, changed, and collected their own compensation for services performed as fiduciaries by collecting Clawbacks;

(o)     Defendants allowed numerous injuries to plan participants through the above activities and failed to stop injuries to plan participants caused by their co-fiduciaries and service providers; and

(p)     Defendants failed to monitor their agents, appointees, formal delegees, and informal designees in the performance of their fiduciary duties.

143.    Defendants further breached their fiduciary duties under ERISA by retaining Optum to provide PBM services for the benefit of Plaintiffs Sohmer and Hawks and the ERISA Subclass, but failing to take reasonable and prudent action to determine whether and ensure that Optum was fulfilling Defendants' fiduciary obligations. Defendants breached their duty to establish policies and procedures to monitor Optum's performance of its duties, to monitor its prescription drug pricing, to monitor the effect of the Overcharges and Clawback Scheme described herein on the amount paid by Plaintiffs Sohmer and Hawks and the ERISA Subclass, to protect the interests of Plaintiffs Sohmer and Hawks and the ERISA Subclass, and to provide complete and accurate information to Plaintiffs Sohmer and Hawks and the ERISA Subclass.

## CLASS ACTION ALLEGATIONS

144.     Plaintiffs bring this action as a class action pursuant to Rule 23(b)(1), (2) and

(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves, the Class, the ERISA

Subclass, and the State Law Subclass, defined as follows:

> **The Class.** All individuals residing in the United States and its territories who are
> enrolled in a health benefit plan issued and/or administered by Defendants or their
> affiliates or insured under Defendants' or their affiliates' health insurance policies,
> who purchased one or more prescription drugs pursuant to such plan and paid a
> cost-sharing amount for such drug(s) that exceeded the applicable Negotiated Price.

145.     Within the Class there are two Subclasses:

> **ERISA Subclass**. All participants or beneficiaries who are enrolled in a health benefit
> plan issued and/or administered by Defendants or their affiliates or insured under
> Defendants' or their affiliates' health insurance policies and subject to ERISA, who
> purchased one or more prescription drugs pursuant to such plan and paid a cost-sharing
> amount for such drug(s) that exceeded the applicable Negotiated Price.

> **State Law Subclass.** All participants or beneficiaries who are enrolled in a health benefit
> plan issued and/or administered by Defendant United Healthcare Services or its affiliates
> or insured under Defendant United HealthCare Insurance's or its affiliates' health
> insurance policies and not subject to ERISA, who purchased one or more prescription
> drugs pursuant to such plan and paid a cost-sharing amount for such drug(s) that
> exceeded the applicable Negotiated Price.

146.     Further, while the Subclasses bring the same RICO claims as the rest of the Class,

the ERISA claims pleaded herein are not asserted by the State Law Subclass members, and the

state law claims pleaded herein are not asserted by the ERISA Subclass. Thus, Plaintiffs Sohmer

and Hawks represent the ERISA Subclass with respect to Counts I-IV, and Plaintiff Fellgren

represents the State Law Subclass with respect to Counts VI-VII. All Plaintiffs represent all Class

members with respect to Count V.

147.     Excluded from the Class and the Subclasses are Defendants, any of their parent

companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and

employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

148.    Plaintiffs reserve the right to redefine the Class prior to certification.

149.    **Class Period.** Plaintiffs will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, under RICO, 18 U.S.C. 1961, *et seq*. and the doctrine of equitable tolling, as well as all state statutory and common law claims at issue here. Further, Plaintiffs reserve the right to refine the Class Period after they have learned the extent of Defendants' fraud, the length of its concealment, and the time period during which "Clawbacks" were taking place.

150.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

151.    The Class and Subclasses are so numerous that the individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class and Subclass members is in the thousands and that the members of the Class and Subclasses are geographically dispersed across the United States. While the exact number and identities of the Class and Subclass members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

152.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclass because Plaintiffs' claims, and the claims of all Class and Subclass members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class and Subclasses are similarly affected by Defendants' wrongful conduct.

- 54 -

153.     There are questions of law and fact common to the Class and Subclasses and these questions predominate over questions affecting only individual Class and Subclass members. Common legal and factual questions include, but are not limited to:

(a)     Whether Defendants are fiduciaries under ERISA;

(b)     Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(c)     Whether Defendants' acts as alleged above breached ERISA's prohibited transaction rules;

(d)     Whether Defendants conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(e)     Whether Defendants conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(f)     Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C. §§ 1341 and 1343;

(g)     Whether Defendants engaged in a scheme to defraud;

(h)     Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(i)     Whether Plaintiffs and the Class members were injured in their property or business as a direct and proximate result of Defendants' racketeering activities;

(j)     Whether Defendants violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit Overcharges, including Spread amounts, to it and thereby overcharged subscribers for prescription drugs;

(k)      Whether the members of the Class and/or Subclasses have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, and/or damages, and/or unjust enrichment;

(l)      Whether Defendants have violated the state laws invoked here; and

(m)      Whether the members of the Class and/or Subclasses are entitled to declaratory and/or injunctive relief.

154.    Plaintiffs will fairly and adequately represent the Class and Subclasses and have retained counsel experienced and competent in the prosecution of class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class and Subclasses. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

155.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class and/or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclasses to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

156.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

157.    Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

158.    Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and Subclass as a whole.

159.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class and Subclasses predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable.

160.    Plaintiffs reserve the right to invoke any provision of Rule 23 appropriate at the time Plaintiffs move to certify the class or otherwise address class certification issues.

## PLAINTIFFS AND THE CLASS ARE ENTITLED TO TOLLING DUE TO FRAUD OR CONCEALMENT

161.    By its nature, Defendants' Overcharge and Clawback Scheme has hidden Defendants' unlawful conduct from injured parties.

162.    Neither Plaintiffs nor the Class members knew of the Overcharge and Clawback Scheme, nor could they have reasonably discovered the existence of the Overcharge and Clawback Scheme, until recently.

163.    Until recent news broke about Defendants' Overcharge and Clawback Scheme, their unlawful conduct was hidden from Plaintiffs and the Class.

164.    Even today, the gag clauses in place between Defendants and providers continue to hide Defendants' unlawful conduct from members of the Class.  Even after the media began reporting about the scheme, as set forth above, Defendants and Optum made false and misleading statements about the scheme in order to continue its concealment.

165.    To the extent that any of the causes of action alleged *infra* are subject to a specific statute of limitations, Defendants' fraud or concealment alleged herein tolls those requirements, for a specific amount of time to be determined as the litigation progresses.

166.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

167.    While the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to Defendants' fraudulent concealment of their unlawful conduct. *Rotella v. Wood*, 528 U.S. 549 (2000).

168.    The Overcharge and Clawback Scheme—by its nature a secret endeavor by Defendants—remains hidden from most members of the Class. Moreover, during the Class Period, as defined above, Defendants actively and effectively concealed their participation in the Overcharge and Clawback Scheme from Plaintiffs and other members of the Class and Subclass through "gag clauses," secrecy policies, and false and misleading public statements. There is no question that Plaintiffs' claims are timely.

## COUNT I

### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) Against Defendants by Plaintiffs Sohmer and Hawks on Behalf of the ERISA Subclass

169.    Plaintiffs Sohmer and Hawks incorporate by reference each and every allegation above as if set forth fully herein.

170.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan.

171.    As set forth above, as a result of being overcharged for prescription drugs, Plaintiffs Sohmer and Hawks and the ERISA Subclass have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for their prescriptions.

172.    Plaintiffs Sohmer and Hawks and the ERISA Subclass have been damaged in the amount of the Overcharges, including Spread. Plaintiffs Sohmer and Hawks and the ERISA Subclass are entitled to recover the amounts they have been overcharged.

173.    Plaintiffs Sohmer and Hawks and the ERISA Subclass are entitled to enforce their rights under the terms of the Plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)    That they have been overcharged;

(b)    For a declaration that they have a right under the ERISA Plans to pay no more for prescription drugs than the Plans specify;

(c)    For a readjudication of claims;

(d)    For a calculation of Defendants' profits from the Overcharge scheme;

(e)    For payment of all amounts due to them in accordance with their rights under the ERISA Plans; and

(f)     For an order enjoining future Overcharges and Clawbacks or any other additional amounts that conflict with their rights under the ERISA Plans.

## COUNT II

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)
### Against Defendants by Plaintiffs Sohmer and Hawks on Behalf of the ERISA Subclass

174.    Plaintiffs Sohmer and Hawks incorporate by reference each and every allegation above as if set forth fully herein.

175.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

176.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

177.    As alleged above, Defendants are fiduciaries of the ERISA Plans of the participants and beneficiaries in the ERISA Subclass. Defendants, as well as Optum, are also parties in interest under ERISA as alleged above.

178.    As fiduciaries, Defendants caused the Plans to engage in prohibited prescription drug transactions.

179.    As parties in interest and fiduciaries, Defendants knowingly received direct and indirect compensation in the form of undisclosed compensation, including Clawbacks, in exchange for the services they provided to Plaintiffs Sohmer and Hawks and the ERISA Subclass

pursuant to their prescription drug Plans in administering these transactions. ERISA

§ 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C). As fiduciaries, Defendants also caused their affiliates,

including Optum—parties in interest—to receive direct and indirect compensation in the form of

undisclosed compensation, including Clawbacks, in exchange for the services these affiliates

provided to Plaintiffs Sohmer and Hawks and the ERISA Subclass. *Id.*

180.    Such transactions are strictly prohibited unless three requirements are met: (1) the

services are necessary for the operation of a plan, (2) the services are furnished under a contract or

arrangement that is reasonable; and (3) the compensation was reasonable. ERISA § 408(b)(2), 29

U.S.C. § 1108(b)(2).

181.    While the burden is on Defendants to invoke and establish this exception, the

compensation paid to each Defendant and their affiliates pursuant to each prohibited transaction

was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the compensation

was excessive and/or unreasonable in relation to the value of the services provided. Defendants'

compensation was also unreasonable because it exceeded the fees that were agreed upon for fully

providing prescription drug benefits. Further, Defendants, as fiduciaries of the ERISA Plans, are

entitled to receive at most reimbursement for their direct expenses. Moreover, the contract or

arrangement was unreasonable because Defendants failed to disclose

Overcharge/Spread/Clawback compensation pursuant to DOL Rule 408b-2(c).

182.    Defendants and their affiliates, including Optum, also received transfers of plan

assets in that they received Plan and employer payments under coinsurance Plans through

Clawbacks in connection with these prescription drug transactions. ERISA § 406(a)(1)(D), 29

U.S.C. § 1106(a)(1)(D).

183.    In addition, Defendants used—and misused—assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed prescription drugs and would be required to pay copayments, coinsurance, or deductible payments which Defendants could appropriate in their Overcharge and Clawback Scheme. Further, Defendants used—and misused—for their own benefit and the benefit of other parties in interest additional assets of the ERISA Plans—the contracts underpinning the ERISA Plans of members of the ERISA Subclass—to effectuate their Overcharge and Clawback Scheme. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

184.    Plaintiffs Sohmer and Hawks and the ERISA Subclass have suffered losses and/or damages and/or Defendants have been unjustly enriched in the amount of the Overcharges and Clawbacks Defendants took for themselves.

185.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

186.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs Sohmer and Hawks and the Class, including but not limited to:

       (a)     an accounting;

       (b)     a surcharge;

       (c)     correction of the transactions and readjudication of claims;

       (d)     disgorgement of profits;

       (e)     an equitable lien;

       (f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

## COUNT III

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)**
**Against Defendants by Plaintiffs Sohmer and Hawks on Behalf of the ERISA**
**Subclass**

187.    Plaintiffs Sohmer and Hawks incorporate by reference each and every allegation above as if set forth fully herein.

188.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interest of its participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

189.    As alleged above, (i) cost-sharing payments by Plans and employers or trusts under coinsurance Plans, (ii) the contracts underpinning the ERISA Subclass members' ERISA Plans, and (iii) Plan contributions are plan assets under ERISA.

190.    Defendants violated all three subsections of ERISA § 406(b).

191.    First, (1) by setting their own compensation from Plan and employer cost-sharing payments and taking their own compensation from that same source, and (2) by using Plan contracts in their own interest or for their own accounts to effectuate the Overcharge and

Clawback scheme, Defendants violated ERISA § 406(b)(1). As to the latter, Defendants acted in their own self interest in using their authority over prescription drug benefit management and administration derived from the Plan contracts and PBM agreements to design and implement the Overcharge and Clawback scheme for their own benefit.

192.    Second, by acting on behalf of each other, themselves, and their affiliates, including Optum, to profit from Clawbacks at the expense of Plaintiffs Sohmer and Hawks and the members of the ERISA Subclass—and thus acting on behalf of parties with interests adverse to the affected participants and beneficiaries—each Defendant engaged in conflicted transactions each time it caused Overcharges and/or took Clawbacks, in violation of ERISA § 406(b)(2). Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with a plan is enough.

193.    Third, through the Overcharge and Clawback Scheme, Defendants violated ERISA § 406(b)(3) because they received consideration for their own personal accounts from other parties—including Optum, pharmacies, Plans, employers, trusts, and the members of the ERISA Subclass—that were dealing with the ERISA Plans in connection with a transaction (a prescription drug transaction) involving the assets of the ERISA Plans.

194.    Plaintiffs Sohmer and Hawks and the ERISA Subclass have been damaged and suffered losses in the amount of the Overcharges and Clawbacks Defendants took through these prohibited transactions.

195.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

196.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff Sohmer and Hawks and the ERISA Subclass, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions and readjudication of claims;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

## COUNT IV

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)
for Violations of ERISA §§ 404 and 409, 29 U.S.C. § 1104 and 1109
Against Defendants by Plaintiffs Sohmer and Hawks on Behalf of the ERISA
Subclass**

197.    Plaintiffs Sohmer and Hawks incorporate by reference each and every allegation above as if set forth fully herein.

198.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan.

199.    Defendants failed to discharge their duties in accordance with the documents and instruments governing the ERISA Plans by requiring pharmacies to charge participants and

beneficiaries cost-sharing payments that exceeded the limits imposed by the ERISA Plans, as alleged above.

200.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), further provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan ("loyalty") and (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ("prudence").

201.    The duties of loyalty and prudence also entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

202.    In setting the amount of and charging Overcharges and taking Clawbacks, Defendants breached their fiduciary duties of loyalty and prudence and violated the terms of the Plans.

203.    Specifically, Defendants acted in furtherance of their own interests and the interests of their affiliates, and thus failed to act solely in the interests of participants and beneficiaries of the ERISA Plans, by requiring pharmacies to charge Overcharges and to remit Clawbacks.

204.    Defendants failed to act with the exclusive purpose of defraying reasonable expenses of administering the ERISA Plans by using their fiduciary control and discretion to

require pharmacies to collect Overcharges and taking Clawbacks from participants and beneficiaries, as alleged above, thus *increasing* expenses unnecessarily and unlawfully.

205.    Defendants failed to act with the care, skill, prudence, and diligence that a prudent administrator would have used in similar circumstances by operating their Overcharge and Clawback scheme.

206.    Defendants violated their duties of loyalty and prudence in at least the many ways alleged in ¶ 142 above.

207.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

208.    Defendants failed to adequately monitor the activities of Optum, including, *inter alia*, failing to monitor the prices charged by Optum for prescription medications provided to Plaintiffs Sohmer and Hawks and the ERISA Subclass and permitting and/or participating in the Overcharge and Clawback Scheme described herein. As such, Defendants failed to monitor their appointees, formal delegees, and informal designees in the performance of their fiduciary duties.

209.    Plaintiffs Sohmer and Hawks and the ERISA Subclass have been damaged and suffered losses in the amount of their cost-sharing payments that exceeded the limits under the ERISA Plans or otherwise were conflicted, excessive, and/or unreasonable, including the amount of Spread that was Clawed back by Defendants.

210.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties

imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

211.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

212.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

213.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs Sohmer and Hawks and the ERISA Subclass, including but not limited to:

    (a)    an accounting;

    (b)    a surcharge;

    (c)    correction of the transactions and readjudication of claims;

    (d)    disgorgement of profits;

    (e)    an equitable lien;

    (f)    a constructive trust;

    (g)    restitution;

    (h)    full disclosure of the foregoing acts and practices;

    (i)    an injunction against further violations; and/or

    (j)    any other remedy the Court deems proper.

## COUNT V

### For Violating RICO, 18 U.S.C. § 1962(c)
### By All Plaintiffs Against Defendants on Behalf of the Class

214.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

215.    At all relevant times, Defendants were associated with an enterprise consisting of each of the pharmacies within their pharmacy network ("Pharmacy Enterprise(s)").

216.     Each Pharmacy Enterprise is a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4).

217.    At all relevant times, each Pharmacy Enterprise has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

218.    Defendants are legally and factually distinct and separate from each Pharmacy Enterprise. Defendants are legal entities that issue and/or administer health plans. On the other hand, each network pharmacy is a separate legal entity with different rights and responsibilities and it operates a distinct line of business as a pharmacy.

219.    Defendants and each network pharmacy are separate and distinct from the pattern of racketeering acts in which the Pharmacy Enterprises engaged.

220.    Defendants agreed to and did conduct affairs and participate in the conduct of the Pharmacy Enterprises. Defendants operated and managed the affairs of the Pharmacy Enterprises through, among other ways, materially-uniform contracts and agreements through which Defendants were able to and did exert control over the Pharmacy Enterprises.  Through the materially-uniform contracts and agreements, Defendants operated and managed the Pharmacy Enterprises' businesses in a manner that effectuated the fraudulent scheme.

221.    For instance, Defendants directed their agent, Optum, to execute contracts with the pharmacies in their network and to issue a "Provider Manual" that "is incorporated in and is a part of" a pharmacy's "Agreement" with Optum.[30] The contracts and the Manual describe the manner in which claims for medically necessary prescription drugs, including claims by Plaintiffs and the Class members, are submitted and processed.

222.    Defendants had the ability to and did in fact direct the Pharmacy Enterprises to intentionally misrepresent—and to direct their pharmacies to intentionally misrepresent—the cost-sharing Overcharges Plaintiffs and the Class members were required to pay to receive medically necessary prescription drugs. Defendants further directed Optum and the Pharmacy Enterprises to collect a specified Overcharge amount. This specified Overcharge exceeded the amount Defendants had promised Plaintiffs and the Class members they would pay for medically necessary prescription drugs. After Plaintiffs and the Class members overpaid for prescription drugs, Defendants directed the Pharmacy Enterprises to return some or all of these funds to Defendants or their agents as Clawbacks.

223.    As described herein, each pharmacy in the Pharmacy Enterprises is a separate legal entity, whose purpose is to provide Plaintiffs and the Class medically necessary prescription drugs in accordance with the terms of their Plans. These legitimate and lawful activities are not being challenged in this Complaint, other than to the extent that they create a false appearance of legitimacy for the fraudulent scheme alleged herein.

224.    Defendants, however, also direct the Pharmacy Enterprises to serve an unlawful purpose; that is, to create a mechanism through which Defendants could obtain additional monies beyond what Plaintiffs and the Class members should have paid under their Plans for medically

---

[30] Provider Manual, *supra* n.9, at 3.

necessary prescription drugs. This fraudulent Overcharge Scheme was not legitimate and Defendants use each pharmacy as a separate and distinct legal entity to disguise and perpetuate the fraudulent scheme. Defendants use the Pharmacy Enterprises as a tool to create an appearance of legitimacy when, in fact, they are using the Pharmacy Enterprises to enforce the fraudulent scheme, which is not a legitimate function. Indeed, as alleged above, Defendants made intentionally misleading statements to the media to try to continue to disguise this Overcharge Scheme as it was being exposed. On behalf of Defendants, their agent, Optum, falsely declared that, as Defendants' PBM, its "program ensures the customer [like Defendants' participants] pays the lowest amount possible within their plan." In this way, Defendants directed and used Optum and the Pharmacy Enterprises as a vehicle for their unlawful activity.

225.    Defendants agreed to and did conduct and participate in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and the Class members. Defendants used the Pharmacy Enterprises to facilitate their goal of overcharging for medically necessary prescription drugs, and were unjustly enriched by overcharging for medically necessary prescription drugs.

**Predicate Acts**

226.    As described herein, Defendants directly and indirectly conducted and participated in the conduct of the Pharmacy Enterprises through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiffs and the Class members.

227.    Pursuant to and in furtherance of its fraudulent billing scheme, Defendants directed the Pharmacy Enterprises to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to, and during, the Class Period and continue to commit

such predicate acts, in furtherance of their fraudulent billing scheme, including: (a) mail fraud, in violation of 18 U.S.C. § 1341; and (b) wire fraud, in violation of 18 U.S.C. § 1343.

228.    As alleged herein, Defendants' conduct went far beyond compliance with "arms-length" contracts—it entailed the exercise of control to impose illegal Overcharges and, at times, Clawbacks on participants. Nor is this Overcharge Scheme a "garden variety" dispute over interpretation of plan terms—it is an intentional scheme to knowingly conceal and impose fraudulent charges in violation of the rights of Plaintiffs and all Class members. Defendants directed the Pharmacy Enterprises to engage in a fraudulent billing scheme to defraud Plaintiffs and the Class members through Overcharges, including Spreads, and Clawbacks. Specifically, this Overcharge Scheme entails: (a) Defendants misrepresenting to Plaintiffs and the Class members through form Plan language that they would pay a certain amount for medically necessary prescription drugs with a present intent to have Plaintiffs pay a higher amount; (b) Defendants entering into an agreement, directly or indirectly, with network pharmacies, under which they agreed to process claims submitted by Plaintiffs and the Class members for medically necessary prescription drugs in accordance with the terms of a particular Plan with a present intent that the claims processing would violate the Plan terms; (c) Defendants entering into an agreement with Optum, and directing Optum to enter into uniform agreements with the network pharmacies, under which Optum created or maintained a provider network by way of contracts and a Provider Manual, which require pharmacies participating in the network to charge Plaintiffs and the Class members for medically necessary prescription drugs in fraudulent amounts specified by Defendants; (d)  Defendants intentionally directing Optum to misrepresent the correct charge for medically necessary prescription drugs as specified in Plaintiffs' and the Class members' Plans, and directing Optum to compel the pharmacies in the network to collect those

improper amounts; (e) Defendants' and/or Optum's "clawing back" and retention, directly or indirectly, of a portion of the amounts improperly collected by and/or their providers, with intent to violate the Plaintiffs' and the Class members' Plans with Defendants; and/or (f) Defendants imposing an agreement or directing Optum to impose an agreement (1) barring pharmacies from advising Plaintiffs and the Class members that they could pay less for medically necessary prescription drugs by purchasing them outside of their respective Plans and (2) barring pharmacies from selling in a transaction that would avoid the Overcharge.

229.    In sum, Defendants' Overcharge Scheme took money from Plaintiffs and the Class members through deceit and false pretenses. Defendants intentionally devised such an Overcharge Scheme and were knowing and active participants in the scheme to defraud Plaintiffs and the Class members. Defendants intended at the time they agreed to administer Plans and knew that they would overcharge for medically necessary prescription drugs and that they or their agents would retain such amounts. Defendants specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

230.    It was and is reasonably foreseeable to Defendants that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means: (a) whenever a Plaintiff or Class member seeks to receive medically necessary prescription drugs, the providers participating in the Optum's pharmacy network enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to Optum, for processing, and, at Defendants' direction, Optum transmits back to the pharmacy the amount of the Overcharge; (b) Defendants' and/or Optum's collecting of the Overcharge money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiffs and the Class

members make payments to the pharmacies in each Pharmacy Enterprise using credit or debit cards, which require the use of interstate wire transmissions; (d) prescription drugs received by Plaintiffs and the Class members through Defendants' fraudulent scheme were delivered by mail or interstate carrier and (e) Defendants', Optum's (as Defendants' agent) and the Pharmacy Enterprises' representatives communicated with each other by mail, interstate carrier, and/or wire transmissions in order to carry out the fraudulent scheme.

231.    Having devised their Overcharge Scheme and intending to defraud Plaintiffs and the Class members, on or about the dates set forth below, Defendants intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

232.    For example, when Plaintiffs purchased prescription drugs, Defendants caused to be transmitted mail, interstate deliveries and/or wire transmissions for the purpose of executing such scheme and artifice on at least the following dates along with the amounts charged and the Overcharges, as Spread, as described above in the sections "Plaintiffs' Purchases" and "Administrative Exhaustion Confirms Overcharges and Reveals Additional Ones."

233.    On or about the dates identified above in these sections, Defendants, through their agent, Optum, sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether Plaintiffs and the prescription drugs were covered under theirs Plans and how much they should pay for drugs; (b) communicating to Plaintiffs the amount of the Overcharge; (c) processing Plaintiffs' payment for such drugs and Overcharges; and (d) processing Defendants' payments to and/or Clawbacks from the provider.

234.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

235.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

236.    The predicate acts were each related to one another in that: (a) Defendants directed to undertake each predicate act with a similar purpose of effectuating their scheme to defraud Plaintiffs and the Class members; (b) each predicate act involved the same participants — (1) Defendants, which directed Optum to make the fraudulent statements and overcharge Plaintiffs and the Class members, (2) pharmacies within Defendants' pharmacy network, which processed claims and provided drugs, and (3) Plaintiffs and the Class members, who received the fraudulent statements and relied on them in paying the fraudulent amounts for medically necessary prescription drugs; (c) each predicate act involved similar victims—Plaintiffs and the Class members who purchased medically necessary prescription drugs; and (d) each predicate act was committed the same way—in response to a request from a Plaintiff or Class member to purchase medically necessary prescription drugs, the pharmacy participating in Defendants' pharmacy network transmitted a request via U.S. Mail or interstate wire to Optum, using the U.S. Mail or interstate wire, and at the direction of Defendants, Optum responded directing the pharmacy to execute Defendants' scheme, and later effectuated their Overcharge Scheme by using the U.S. Mail or interstate wire to overbill the Plaintiff or Class member; and (e) the predicate acts could not have been conducted, nor Defendants' scheme effectuated, without the existence and use of U.S. Mail or interstate wire.

237.    On information and belief, Defendants conduct such racketeering activity through an ongoing and regular way of doing business, and they will continue to engage in such racketeering activity.

238.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and the Class members have been injured in their business and property. Plaintiffs and the Class members were injured by reason of Defendants' RICO violations because they directly and immediately received through interstate wires or mail a fraudulent demand for payment, incurred a corresponding debt and paid fraudulent charges for medically necessary prescription drugs. Their injuries were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Defendants' RICO violations (and commission of underlying predicate acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

239.    Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Defendants and other appropriate relief.

## COUNT VI

**For Breach of Contract**
**Against Defendant United HealthCare Services, Inc. by Plaintiff Fellgren**
**on Behalf of All Members of the State Law Subclass**

240.    Plaintiff Fellgren incorporates by reference each and every allegation above as if set forth fully herein.

241.    Defendant United HealthCare Services offered, sold, and administered health insurance plans and ASO services in all 50 states during the Class Period alleged herein.

242. The Plans constitute contracts under the laws of each of the states in which they were sold and administered, and in all material respects for this action, the Plans are uniform contracts.

243. The definitions of the terms used in the State Law Subclass members' Plans are materially the same, including, but not limited to, the definitions of the policy terms such as: "Allowed Amount," "Deductible," "Benefits," "Co-payment," "Co-insurance," "Covered Health Services," "Eligible Expenses," "Pharmaceutical Product(s)," "Premium," "Prescription Drug Charge," "Prescription Drug Product," and "Usual and Customary Charge."

244. Plaintiff Fellgren and the State Law Subclass members are participants in the Plans that Defendant United HealthCare Services offered and administered and are either parties to or third-party beneficiaries of such Plans.

245. Defendant United HealthCare Services breached the Plans in each of the fifty states by requiring participants and beneficiaries to pay fees for prescription drugs in excess of the fees authorized in the plans, including Overcharges and Spread, as alleged herein, and in taking Clawbacks.

246. Plaintiff Fellgren and the State Law Subclass members have suffered damages as result of Defendant United HealthCare Services's breaches.

247. Plaintiff Fellgren and the State Law Subclass members are entitled to recover damages and other appropriate relief, as alleged below.

### COUNT VII

**For Breach of Covenant of Good Faith and Fair Dealing
Against Defendant United HealthCare Services, Inc. by Plaintiff Fellgren
on Behalf of All Members of the State Law Subclass**

248. Plaintiff Fellgren incorporates by reference each and every allegation above as if set forth fully herein.

249.   All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff Fellgren's and the State Law Subclass members' contracts with Defendant United HealthCare Services.

250.   Plaintiff Fellgren and the State Law Subclass members purchased the benefits under the Plans that Defendant United HealthCare Services offered and administered, and they are either parties to, or third-party beneficiaries of, such health benefit plans.

251.   Defendant United HealthCare Services's performance under the plans deprived Plaintiff Fellgren and the State Law Subclass members of the prescription drug prices that a reasonable consumer would expect to receive under the Plans.

252.   On information and belief, Defendant United HealthCare Services's actions, as alleged herein, were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize Defendant United HealthCare Services's and/or its agents' revenue at the expense of Plaintiff Fellgren and the State Law Subclass Class members in contravention of the reasonable expectations of Plaintiff Fellgren and the State Law Subclass Class members.

253.   Defendant United HealthCare Services has breached the covenant of good faith and fair dealing in the Plans as alleged herein.

254.   Plaintiff Fellgren and the State Law Subclass members have sustained damages as a result of Defendant United HealthCare Services's breaches as alleged herein.

255.   Plaintiff Fellgren and the State Law Subclass members are entitled to recover damages and other appropriate relief, as alleged below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclasses, pray for relief as follows as applicable for the particular claim:

- 78 -

A.     Certifying this action as a class action and appointing Plaintiffs and the counsel listed below to represent the Class and Subclasses;

B.     Finding that Defendants are fiduciaries and/or parties in interest as defined by ERISA;

C.     Finding that Defendants violated the Plan terms;

D.     Finding that Defendants violated their fiduciary duties of loyalty and prudence to ERISA Subclass members and awarding Plaintiffs Sohmer and Hawks and the ERISA Subclass such relief as the Court deems proper;

E.     Finding that Defendants engaged in prohibited transactions and awarding Plaintiffs Sohmer and Hawks and the ERISA Subclass such relief as the Court deems proper;

F.     Enjoining Defendants from further such violations;

G.     Finding that Plaintiffs Sohmer and Hawks and the ERISA Subclass are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H.     Awarding Plaintiffs, the Class, and the Subclasses damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I.     Ordering Defendants to restore all losses to Plaintiffs Sohmer and Hawks and the ERISA Subclass and disgorge unjust profits and/or other assets of the ERISA Plans;

J.     Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiffs Sohmer and Hawks and the ERISA Subclass to restore their losses, remedy Defendants' windfalls, and put Plaintiffs Sohmer and Hawks and the

- 79 -

ERISA Subclass members in the position that they would have been in if Defendants had not breached their duties or committed prohibited transactions;

K.      Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the ERISA Subclass and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans of the ERISA Subclass, including as pharmacy benefit administrators and managers;

L.      Awarding treble damages in favor of Plaintiffs and the Class members against Defendants for all damages sustained as a result of Defendants' violations of RICO, in an amount to be proven at trial, including interest thereon;

M.      Awarding Plaintiffs, the Class, and the Subclasses equitable relief to the extent permitted by the above claims;

N.      Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

O.      Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to RICO, 18. U.S.C. § 1964(c).

P.      Awarding Plaintiffs, the Class, and the Subclasses their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

Q.      Finding that Defendants are jointly and severally liable for all claims; and

R.      Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 30, 2018                          Respectfully submitted,

                                                      *s/ Craig A. Raabe*
                                              Robert A. Izard
                                              Craig A. Raabe
                                              Christopher M. Barrett
                                              IZARD, KINDALL & RAABE, LLP
                                              29 South Main Street, Suite 305
                                              West Hartford, CT 06107
                                              Telephone: 860-493-6292
                                              Facsimile: 860-493-6290
                                              rizard@ikrlaw.com
                                              craabe@ikrlaw.com
                                              cbarrett@ikrlaw.com

                                              William H. Narwold
                                              Mathew Jasinski
                                              MOTLEY RICE LLC
                                              One Corporate Center
                                              20 Church Street, 17th Floor
                                              Hartford, CT 06103
                                              Telephone: 860-882-1681
                                              Facsimile: 860-882-1682
                                              bnarwold@motleyrice.com
                                              mjasinski@motleyrice.com

                                              Derek W. Loeser
                                              Gretchen S. Obrist
                                              Matthew Gerend
                                              Laura Zanzig-Wong
                                              KELLER ROHRBACK, LLP
                                              1201 Third Avenue, Suite 3200
                                              Seattle, WA 98101-3052
                                              Telephone: 206- 623-1900
                                              Facsimile: 206-623-3384
                                              dloeser@kellerrohrback.com
                                              gobrist@kellerrohrback.com
                                              mgerend@kellerrohrback.com
                                              lzanzig-wong@kellerrohrback.com

Joseph P. Guglielmo
Carey Alexander
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile: 860-537-4432
ecomite@scott-scott.com

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: 516-699-8890
Facsimile: 516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

**Attorneys for Plaintiffs**